UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

U.S. DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AUG - 1 2024

FILED

KHAMANI LODGE,

Plaintiff,

v. No. CV124- 124

UNITED STATES OF AMERICA

Defendant,

TONY MILON, DIRECTOR

ATLANTA VA REGIONAL OFFICE

PETITION AND MOTION FOR INJUNCTIVE RELIEF

PETITION FOR A WRIT OF MANDAMUS

Now comes the plaintiff filing this complaint under 5 USC 702, 704,706 (1) (2) B and D of the Administrative Procedure Act in that the Defendant through it's Atlanta Regional Office has denied the Plaintiff not only any kind of meaningful administrative review of his claim for benefits for Special Monthly Compensation T (Traumatic Brain Injury) SMC T but NO review of any kind in effect denying the plaintiff the right to petition the Board of Veterans Appeals, the Court of Veterans Claims or the Federal Circuit. Such action by the defendant violates the plaintiff 's right to petition the government to address a grievance, and deny the plaintiff due process to his new monthly compensation of $10,650.00 per month under SMC T.

The Defendant has a number of legal duties to the plaintiff including to assist the plaintiff in developing his case in a non-adversarial matter and the plaintiff must make this Court aware that at all times the benefit of the doubt always goes to the veteran including this emergency request to order the defendant to pay the Special Monthly Compensation while this matter is pending.

The plaintiff is a 100% disable veteran under the laws administer under title 38 USC by the Secretary of Veterans Affairs. The plaintiff is a **"gulf war veteran"** and was exposed along with 200,000 other service personnel to the nerve agent Sarin. The Secretary as the facts will show has fought, lied and cover up this illness for 30 years and did not go to Congress to redress any issues or concerns until the PACT ACT which was an umbrella for burn pits toxic exposure related claims including Gulf War exposure in which it is now ready to pay out claims.

However, the issue here is the plaintiff filed his claim in **May 1992** and the Defendant was aware of the Sarin exposure to troops in October 1991 and its War Department and Veterans Health and Benefits Services **covered up the exposure for 30 years** and now the defendant owes the plaintiff **$2,000,000.00** plus in back pay and monthly compensation of $10,650.00. The plaintiff will address this later.

The defendant has "abused its discretion" by disallowing all redress of administrative review process thus opening the door to the Court under **Loper Bright Enterprises v. Raimondo 22-451** U.S. Supreme Court. Once the Supreme Court threw Chervon doctrine in the trash, review of the Secretary abusive tactics can now be directly address in U.S District Court for **"all"** the Defendant had to do is [grant or deny] the claim and allow the plaintiff to appeal to the Board and from there judicial review is warranted if needed. Instead, the Defendant just cancelled

the claim and refused to process the claim and there are no other means of redress for the plaintiff but **request his property be paid or mandamus**.

FACTS OF THE CASE

In the late 1980's the Regan Bush Administration gave a Dictator name Saddam Hussien Sarin Gas to kill the people of Iran and once Saddam attempted to take over the OIL rich nation of Kuwait the United States went to War with Iraqi.

According to a Congressional Investigation **"REPORT OF THE INVESTIGATION UNIT ON GULF WAR ILLNESSES"** Plaintiff **Exhibit A** which is a 300-page report is the Bible of what happen and this report was done in **"1998"** and it details everything. Iraqi had tons of the poison Sarin and the defendant knew and tried to destroy the Sarin but **"inadvertently exposed U.S troops to the deadly gas" on March 4, 1991.**

Sadly, the defendant also has contract doctors specifically QTC a Lockheed Martin Company that willfully falsified veterans' medical records and conditions. It is Standard Practice to such a degree that the government admitted in the matter **Monk v. US No. 3:22cv1503 (SRU) District of Connecticut**. However, in this case the Defendant sent the plaintiff to two Compensation and Pension examinations one for SMC T and the other PTSD. The **SMC T examination Doctor on April 18, 2024, "Dr. Clay"** was an Air Force Flight Surgeon who served in the Gulf and performed many fields surgery and **"combat injuries are his specialty"** and he also holds a **Doctorate in Jurisprudence**. The PTSD doctor, Dr. Bell, is a professor

of Psychology and has worked with **combat veterans for years.** The staff at the Atlanta Regional Office who read the C an P examination told the plaintiff the reports are "**air thigh" very favorable** and did not understand why the claim was cancelled, including FOIA request. Normally VA especially the Atlanta Regional Office would send veterans to QTC doctors who are NOT qualified in specialty areas and would "Doctor Shop" **until they get a Doctor to say NO or falsified the medical reports or make false statement** so the Regional Office can deny the claim(s) and place the veteran in an appeal status for years. The Court in Connecticut found the VA has always discriminated against Black veterans since WW2. The April 18, 2024 examination and June 22, 2024 examination were written in favor of the veteran with the evidence submitted from AU Neurology and scientific research see **Plaintiff Exhibit B** and even thought **Exhibit A** clearly states the defendant knew everything in1998, top VA officials did everything to undermined the results of the studies and imped compensation efforts of veterans see **Plaintiff Exhibit C and D**. The defendant Atlanta Office has taken obstruction to entire new level of low so when they cannot get doctors to make false statements and create false reports, they just cancelled claims as if they were never filed. You can't have C and P exams without a live claim. The claim simply does not exist and the defendant just simply cancelled them for as the Court can see nothing exist and the defendant cancelled the plaintiff FOIA request to get copies of the C/P examination see **Plaintiff Exhibit E.**

The claim of SMC T in related to Gulf War claims is very complex for even the VA Inspector General are having trouble trying to apply the law to the facts. Now the plaintiff apparently has PTSD so the 100% rating is not going to change but it does give the Court a little wiggle room on that there is a place under **Special Monthly**

**Compensation R 1** see **Plaintiff Exhibit F "Housebound**" and aid and attendant is an either OR and does not require both in that the PTSD is a direct result of the Brain Injury of being exposed to Poison Nerve Agent Sarin SMC T and the monthly compensation is $9,500.00 per month. **Exhibit E** shows the plaintiff did not cancel his claims and it would be a false statement if the defendant's agent makes such a statement. Once the government Attorney's reads the C and P examination, the plaintiff does not believe that the Defendant Attorney is going to opposed this request. Those C and P examinations are the **Subject Matter Experts** the defendant provided and there is nothing to opposed and this matter shows the defendant Veterans Benefit Administration discriminatory conduct is still alive and well and is denying the veteran all means of review as provided by law under title 38 United States Code for no other reason other than the dark skin tone of the plaintiff, that is it.

The plaintiff was/ is entitled to a decision on his claim and the defendant had a legal duty to response to the claim. Because veteran's rights are limited in the course of action to appeal to the Board, the Veteran's Court and of the Federal Circuit, the defendant cancelling the plaintiff claim denies deny all avenues of review. The government must present the **<u>C and P exams</u>** to the court and Post Chevron Doctrine, the Court can now sit in substitute and apply the law to the facts and render judgment and provide the **<u>relief requested SMC R 1 Housebound without delay</u>**. Because the defendant failed over 30 years to provide any relief or even attempted to address Gulf War Illness and failed to go to Congress or write new regulation to alter the SMC T pay, they are stuck with their own neglect and it amounts to cruelty to be financially punished for serving United States in Wartime and be denied the legal benefits provided by law for skin tone discrimination. The

medical advancement and scientific community never gave up the defendant lies and cover up caught the Atlanta Regional Office sleeping and now the defendant owes 200,000 veterans that were exposed this payment. The plaintiff is requesting that **the Court order the defendant to pay the plaintiff SMC R 1 House Bound rate without delay as of August 1, 2024 and provide the court the amount of back pay owed to the Plaintiff and pay the $2,000,000.00 plus in back pay for the plaintiff filed his claim May 1992.**

The Court can also order the defendant to respond to the claim. The defendant took the action they took because the Drs. **would not make a false statement or create a false report to or for the Atlanta Regional Office.** The facts are undisputed, the evidence is undisputed and the lies, coverup and illegal tactics used by the Atlanta Regional Office are also undisputed for such a writ of mandamus is the appropriate tool and relief should be granted by the Court for it is either **SMC R 1 Housebound at $9,500.00 or SMC T at $10, 650.00.** The defendant has never done anything to assist and the defendant has the legal duty to assist and no matter what the government presents to the Court **the benefit of the doubt goes to the veteran even in this request of the Court and this is why the defendant should have decided the claim whether granting it or denying it**. This is why the defendant should have processed the claim and not cancelled it and deny the plaintiff access to the administrative process.

For the Plaintiff
Khamani Lodge

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

KHAMANI LODGE V UNITED STATES OF AMERICA

CERTIFICATE OF SERVICE

This is to certify that the following information was deliver to the US Attorney at 600 James Brown Blvd suite 200 Augusta Georgia 30901.

Via certified mail

Tony Milon

Director Atlanta VA Regional Office

1700 Clairmont Road

Decatur, Georgia 30033

For the plaintiff

Khamani Lodge

924 GA Hwy 80 W

Waynesboro, Georgia 30830

470 455 5526

Khlodge4115@gmail.com

Ex. A

S. PRT. 105–39, Part I

## COMMITTEE ON VETERANS' AFFAIRS
UNITED STATES SENATE

# REPORT OF THE SPECIAL INVESTIGATION UNIT ON GULF WAR ILLNESSES

ONE HUNDRED FIFTH CONGRESS

ARLEN SPECTER, *Chairman*

Ex. A

50–273 CC U.S. GOVERNMENT PRINTING OFFICE: 1998
For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402

**COMMITTEE ON VETERANS' AFFAIRS**

ARLEN SPECTER, PENNSYLVANIA, *Chairman*

STROM THURMOND, SOUTH CAROLINA
FRANK H. MURKOWSKI, ALASKA
JAMES M. JEFFORDS, VERMONT
BEN NIGHTHORSE CAMPBELL, COLORADO
LARRY E. CRAIG, IDAHO
Y. TIM HUTCHINSON, ARKANSAS

JOHN D. ROCKEFELLER IV, WEST VIRGINIA
BOB GRAHAM, FLORIDA
DANIEL K. AKAKA, HAWAII
PAUL WELLSTONE, MINNESOTA
PATTY MURRAY, WASHINGTON

CHARLIE BATTAGLIA, *Staff Director*
JIM GOTTLIEB, *Minority Staff Director / Chief Counsel*
DAT P. TRAN, *Editorial Director*

## SPECIAL INVESTIGATION UNIT ON GULF WAR ILLNESSES

MICHAEL J. ROTKO
*Special Counsel*

SHERYL L. WALTER
*Deputy Special Counsel*

MARY AGOCS
VINCENT S. AVERNA
PATRICK D. BALESTRIERI
DAVID J. BALLAND
MEG KLUCSARITS BEST
MELISSA C. BROWN
WILLIAM T. CAHILL
KATHLEEN A. COLLIER
SUSAN M. CONRATH
KIM W. HAMLETT
QUENTIN P. KINDERMAN
MICHAEL LEINS
MAUREEN LENIHAN
TERENCE M. LYNCH
JEFFREY MCGOWAN
JAMES C. MOORE
JOHN D. NACHMANN
MARION M. SLACHTA
WILLIAM R. STANCO
HEIDI K. SULLIVAN
LEANN YOUNG

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ........ 1
BACKGROUND ........ 1
KEY FINDINGS ........ 3
I. Preparedness Shortfalls for Effective Defense Against Battlefield Hazards Existed Before and During the Gulf War and Continue Today ........ 4
II. Insufficient Program Monitoring Hinders the Department of Defense's and Department of Veterans Affairs' Effectiveness in Serving Gulf War Veterans ........ 6
III. The Department of Defense's and the Department of Veterans Affairs' Failure to Collect Information, Retain Records, and Generate Valid Data Analysis Impedes Effective Responses to Gulf War Veterans ........ 6
IV. The Department of Defense and Department of Veterans Affairs Must Make Cooperation and Coordination a Top Priority to Ensure Timely and Effective Service for Gulf War Veterans ........ 7
CONCLUSION ........ 8
RECOMMENDATIONS ........ 9

INTRODUCTION ........ 15

REVIEW OF DEFENSE DEPARTMENT AND INTELLIGENCE COMMUNITY ACTIONS, GULF WAR VETERANS' HEALTH, AND IMPLICATIONS FOR THE FUTURE ........ 19
INTRODUCTION ........ 19
THE KHAMISIYAH WEAPONS DEPOT DEMOLITION ........ 21
M8A1 Chemical Detection Alarms ........ 22
Critical Site Information Not Passed to Demolition Team at Khamisiyah ........ 23
Army Inspector General Investigation of Khamisiyah ........ 24
UNSCOM Concludes Chemical Weapons Were at Khamisiyah ........ 25
UNSCOM Rates Iraq CW Sarin Purity as High as 75 Percent ........ 26
Misidentification of Khamisiyah Site Key to Intelligence Confusion ........ 28
External Pressures Prompted U.S. Government Investigation Into Khamisiyah ........ 28
Intelligence Operations Scrutinized ........ 29
Intelligence Operations Were Not Fully Integrated and Coordinated ........ 30
CIA, Joint Intelligence Liaison Element Not Plugged-In to All Intelligence Operations ........ 30
Joint Agency Efforts Begin to Resurrect Gulf War Intelligence ........ 30
MITRE Report ........ 32
DOD/OSAGWI-CIA ATTEMPTS TO RECONSTRUCT KHAMISIYAH ........ 33
Background ........ 33
"Super Plume" of All Five Models Developed to Show "Worst Case Scenario" ........ 34
Questionable Methodology Was Used in Developing the "Super Plume" Model ........ 36
AFTAC, A Key Modeling Resource, Not Included In Modeling Process ........ 38
AFTAC Recreated Khamisiyah Meteorology ........ 39
AFTAC Model Differs From OSAGWI/CIA Results ........ 39
Lessons Learned From the Khamisiyah Modeling Effort ........ 40

ARE THERE OTHER KHAMISIYAHS? . . . . . 44
Czech/French Chemical Weapons Detections Reports . . . . . 45
Czech Detections Not Verified by Allies . . . . . 45
Czech Equipment Very Sensitive . . . . . 46
Czechs Point to Bombing Residue as Chemical Source . . . . . 46
Did the French Detect Mustard Agent? . . . . . 47
Senate Investigators Meet with Allies . . . . . 47
WEAKNESSES IN CHEMICAL AND BIOLOGICAL READINESS . . . . . 48
GAO Critical of Chemical/Biological Training Programs . . . . . 49
The U.S. Military Was Not Well-Prepared for CW Attacks in the Gulf War . . . . . 49
The Industrial Base Was Slow to Respond to Production Needs in Support of CW Preparedness . . . . . 50
Training and Technology Limitations . . . . . 51
M8A1 Alarm Systems Sounded Frequent False Alarms . . . . . 51
Fox Vehicle Readings May Have Resulted in More Questions than Answers . . . . . 51
Biological Agent Detection Capabilities Are "Rudimentary" . . . . . 52
Chemical and Biological Weapons Visibility and Funding . . . . . 52
STEPS TAKEN BY DOD TO INCREASE CHEMICAL AND BIOLOGICAL WEAPONS DEFENSE READINESS . . . . . 53
Joint Doctrine Development and Funding Levels for CBW Defense . . . . . 53
DOD to Develop Service-Wide Protocols . . . . . 53
Army Chemical Force to Be Strengthened . . . . . 53
New Chemical and Biological Agent Alarms Are Being Developed . . . . . 54
DOD's Anthrax Vaccination Plan . . . . . 54
Logistical and Technical Challenges . . . . . 55
DOD Must Set Priorities For Improving CBW Preparedness . . . . . 55
INFORMATION COLLECTION AND RECORDKEEPING SHORTFALLS DURING THE GULF WAR . . . . . 56
Records Mismanagement Complicates Analysis of Gulf War Events . . . . . 56
Troop Movement and Medical Records . . . . . 56
Health Surveillance Shortfalls . . . . . 57
Vaccination Records . . . . . 57
Records of Pesticide Use Were Not Kept . . . . . 58
CENTCOM's Records Management System Is Ineffective . . . . . 58
Records Management Enforcement Lacking . . . . . 58
DEPLETED URANIUM . . . . . 58
OSAGWI CASE NARRATIVES . . . . . 59
CONCLUSION . . . . . 62
RECOMMENDATIONS . . . . . 62

**ASSESSMENT OF GULF WAR VETERANS' HEALTH CARE SERVICES AND COMPENSATION BENEFITS AT THE DEPARTMENT OF VETERANS AFFAIRS** . . . . . 65
INTRODUCTION . . . . . 65
OVERVIEW OF VA'S RESPONSIBILITIES TOWARD GULF WAR VETERANS . . . . . 66
Lack of Cooperation Between VA's Health and Benefits Administrations Hinders Implementation of the "One-VA" Approach . . . . . 68
VA Disability Compensation and the Gulf War Veteran . . . . . 68
Service-connection for Disabilities and "Undiagnosed Illnesses" . . . . . 69
Processing of Gulf War Veterans' Compensation Claims . . . . . 70
VA Health Care Services Available to Gulf War Veterans . . . . . 71
Special Health Care Eligibility For Gulf War Veterans . . . . . 71

VBA'S DECISIONS REGARDING COMPENSATION CLAIMS PROCESSING OF GULF WAR CLAIMS HAVE BEEN INCONSISTENT AND COUNTERPRODUCTIVE ............ 72
INFORMATION MANAGEMENT PROBLEMS HINDER TIMELY AND EFFICIENT DELIVERY OF VA BENEFITS AND HEALTH CARE SERVICES TO GULF WAR VETERANS ........ 75
INEFFECTIVE MONITORING OF HEALTH CARE AND BENEFITS ADMINISTRATION RESULTS IN INCONSISTENT DELIVERY OF VA BENEFITS TO GULF WAR VETERANS .. 78
VA Does Not Comply with its Own Regulations and Policy Directives .......... 80
Inadequate Internal Information Sharing at VA Creates Barriers That Hinder Efforts to Deliver Benefits and Services ........ 83
INADEQUATE IMPLEMENTATION OF SERVICES AND BENEFITS FOR GULF WAR VETERANS ........ 87
VA Has Underestimated What Is Needed by its Veterans Registry Physicians to Deliver Priority Health Care Services to Gulf War Veterans ........ 89
Training to Veteran Registry Physicians Is Uneven ........ 90
VA's National Level Program Managers Do Not Exert Sufficient Oversight of Implementation of Gulf War Veteran Programs and Services ........ 90
GULF WAR VETERANS ARE DISSATISFIED WITH VHA'S SERVICE DELIVERY ............ 91
VA DOES NOT MAINTAIN ADEQUATE INFORMATION SYSTEMS TO ACCURATELY TRACK IMPORTANT DATA REGARDING GULF WAR VETERANS ........ 92
VBA DOES NOT ADEQUATELY UTILIZE ITS QUALITY ASSESSMENT TOOLS TO OVERCOME KNOWN DEFICIENCIES ........ 94
VHA EFFORTS AT QUALITY ASSURANCE ARE NOT ALWAYS SUCCESSFUL ........ 95
CONCLUSION ........ 96
RECOMMENDATIONS ........ 97

**EVALUATION OF WARTIME EXPOSURES, GULF WAR VETERAN HEALTH CONCERNS AND RELATED RESEARCH, AND UNANSWERED QUESTIONS** ........ 101
INTRODUCTION ........ 101
HEALTH ISSUES PRIOR TO THE GULF WAR DEPLOYMENT ........ 101
Background on the Military Health Care System's Role in Maintaining Troop Health ...... 101
Pre-Deployment Medical Efforts to Protect Against Biological and Chemical Weapons Threats ........ 102
Background on the FDA and Investigational New Drugs (INDs) ........ 102
DOD Efforts to Administer Two INDs, Botulinum Toxoid Vaccine and PB, During the Gulf War ........ 103
DOD Applied to FDA to Use Investigational New Drugs Without Informed Consent During the Gulf War ........ 104
FDA Issues an Interim Final Rule That Allows DOD to Use PB and Botulinum Toxoid Vaccine Under Certain Conditions Without Informed Consent ........ 104
HEALTH ISSUES DURING DEPLOYMENT ........ 105
Background on Deployed Troops ........ 105
Medical Force Build-up and Deployment for Operations Desert Shield/Storm ........ 107
Other In-Theater Military Medical Preparations ........ 107
Medical Force Capabilities and Shortcomings ........ 107
Shortcomings in Army Medical Capabilities ........ 108
Shortcomings in Navy Medical Capabilities ........ 108
Shortcomings in Air Force Medical Capabilities ........ 109
The Link between Potential Exposures to Harmful Agents and Adverse Health Effects ..... 109
Background ........ 109
Measuring Exposure ........ 110

Summary of Potential Troop Exposures to Harmful Agents During the Gulf War .. 110
Biological Warfare Agents ... 111
Chemical Warfare (CW) Agents ... 112
Depleted Uranium ... 113
Heat ... 114
Infectious Diseases ... 115
Oil Well Fires ... 116
Pesticides ... 117
Pyridostigmine Bromide ... 118
Sand ... 119
Solvents: Petroleum Products, Diesel Heaters, and Others ... 119
Stress ... 120
Vaccines ... 121
Effect of Multiple Exposures on Gulf War Veterans' Health ... 124
Poor Data Collection on Gulf War Exposures Hinders Current Treatment and Research Efforts ... 124
Poor Tracking of Gulf War Health Status Hinders Current Treatment and Research Efforts . 125
Improved Medical Surveillance during the Gulf War Could Have Collected Important Health Information ... 125
HEALTH ISSUES FOLLOWING DEPLOYMENT ... 126
VA and DOD Establish Registries to Evaluate Gulf War Veterans' Health Complaints ..... 126
VA's Persian Gulf Registry and Uniform Case Assessment Protocol and DOD's Comprehensive Clinical Evaluation Program for Persian Gulf War Veterans ... 127
Differences Between VA and DOD Gulf War Registries ... 127
External Reviews of the Registries ... 128
Demographic and Health Status Profiles of Registry Participants ... 129
Gulf War Veterans And The Dilemma of Unexplained Illnesses ... 137
Understanding the Link Between War Experiences and Health ... 138
Attempts to Devise Case Definitions for Unexplained Illnesses ... 139
Diagnosable Conditions and Death Rates in Gulf War Veterans ... 139
Concerns About the Health of Gulf War Veterans' Family Members ... 140
Persian Gulf Spouse and Children Examination Program ... 140
Overview of Independent Scientific Panel Reports on Gulf War Health Consequences ..... 141
Institute of Medicine: Health Consequences of Service During the Gulf War ...... 142
National Institutes of Health (NIH) Technology Assessment Workshop ... 143
Defense Science Board Task Force on Persian Gulf War Health Effects ... 143
The Presidential Advisory Committee on Gulf War Veterans' Illnesses ... 144
Long-Term Health Consequences of Gulf War Exposures ... 145
Current State of Treatment of Gulf War Veterans by DOD and VA ... 146
Department of Defense: Walter Reed Army Medical Center's Gulf War Health Center ... 146
VHA Treatment of Gulf War Veterans ... 147
SIU Survey of VA Hospitals on the Status of Gulf War Health Programs ... 147
Current State of Federal Research Programs on Gulf War Health Issues ... 148
Persian Gulf Veterans Coordinating Board Research Working Group ... 148
Federal Research Funding Levels and Priorities ... 148
Gulf War Illnesses Federal Research Funded Outside the Peer Review Process ..... 151
Additional Research ... 151
Allied Coalition Health Experiences ... 152
CONCLUSION ... 153
RECOMMENDATIONS ... 154

**POSSIBLE LONG TERM HEALTH CONSEQUENCES OF GULF WAR EXPOSURES: AN INDEPENDENT EVALUATION** ... 157
INTRODUCTION ... 157
HEALTH EFFECTS OF EXPOSURES TO NEUROTOXIC AGENTS USED IN THE PERSIAN GULF WAR, PREPARED BY FREDRIC GERR, M.D. ... 159
PERSISTENT HEALTH EFFECTS OF PESTICIDES AND OTHER CHEMICALS USED IN DESERT STORM AND DESERT SHIELD, PREPARED BY MATTHEW KEIFER, M.D., M.P.H. ... 171
POSSIBLE POTENTIATION OF PYRIDOSTIGMINE BROMIDE BY PESTICIDES, PREPARED BY JAMES MOSS, Ph.D. ... 181
A DISCUSSION OF ISSUES CONCERNING THE ROLE OF STRESS IN VETERANS' REPORTING OF SYMPTOMS FOLLOWING DEPLOYMENT TO THE GULF WAR, PREPARED BYRICHARD LETZ, Ph.D. ... 194
AIR POLLUTANT EXPOSURE AND POTENTIAL HEALTH EFFECTS AMONG PERSIAN GULF WAR VETERANS, PREPARED BY MICHAEL LEBOWITZ, Ph.D. ... 208
MYCOPLASMA AND ILLNESS, PREPARED BY KEVIN DYBVIG, Ph.D. ... 216
EPIDEMIOLOGICAL STUDIES OF THE REPRODUCTIVE HEALTH OF PERSIAN GULF WAR VETERANS, PREPARED BY SHANNA SWAN, Ph.D. ... 226
GULF WAR REPRODUCTIVE HAZARDS, PREPARED BY MELISSA McDIARMID, M.D., M.P.H. ... 233
CARCINOGENS IN THE PERSIAN GULF CONFLICT, PREPARED BY MELISSA McDIARMID, M.D., M.P.H. ... 257

GLOSSARY ... 273

NOTES ... 279

# EXECUTIVE SUMMARY

Nearly eight years ago, on August 2, 1990, Iraq invaded Kuwait, marking the beginning of what is now known as the Gulf War. Within a week of Iraq's act, the United States began the largest single deployment of troops to a foreign country since the Vietnam era. The consequence of fighting this high-tech air and ground war was a quick and decisive victory, with relatively few casualties and no apparent acute effects from offensive use of the chemical or biological weapons that many had feared Iraq would use. However, the long-term impact of deployment to a desert environment on those troops, their families, government agencies, and the public was immense and unanticipated. At first, the significance of these health problems was minimized by many inside and outside of the government. It may be that our pride and confidence in our military's seemingly near-perfect performance was so great that nothing, not even the emerging health problems of many veterans of this war, was allowed to diminish this victory. The decisive outcome and the lack of anticipated widespread casualties from offensive use of chemical or biological weapons led many to look only at what was known at the time and see it as reinforcement of the common assumption that nothing happened connected with that deployment that would later affect the health of many Gulf War veterans.

In many ways, the story of the Gulf War experience can be seen as a microcosm for continued concerns regarding our nation's military preparedness and ability to respond effectively to health problems that may arise after deployments. This investigation found that in the Gulf War, U.S. military forces were not fully prepared to fight a war in which chemical or biological weapons might be used, and that this lack of readiness continues today. Both the Department of Defense and the Department of Veterans Affairs have given insufficient priority to matters of health protection, prevention, and monitoring of troops when they are on the battlefield and thereafter when they become veterans. The Department of Defense and the Department of Veterans Affairs have been negligent by failing to collect information adequately about, keep good health records on, and produce reliable and valid data to monitor the health care and compensation status of Gulf War veterans who are now ill. These agencies must find effective ways to manage and share information and work together to ensure that Gulf War veterans who face troubling health problems are helped—not hindered—in getting the health care and assistance they deserve.

## BACKGROUND

This report tells the story of the events of the Gulf War that potentially have affected the health of some who served there and of the government's actions in response to those health problems. It is about foresight, it is about bureaucracy, and it is about accountability. It reflects a year-long

bipartisan special investigation by a team of experts assembled by the Senate Committee on Veterans' Affairs in the spring of 1997. The Committee on Veterans Affairs has actively conducted oversight on Gulf War veterans concerns since 1993, including holding committee and field hearings and issuing a 1994 staff report on this issue. The Special Investigation Unit on Gulf War Illnesses (SIU) examined the policies and actions of the U.S. government that have had an impact on the current health of the men and women who served during the Gulf War. The SIU's investigation encompassed specific areas of concern: the Department of Defense's (DOD's) plans and policies; the intelligence community's role; health risks encountered by U.S. troops during the war; record keeping before, during and after it; and the Department of Veterans Affairs' (VA's) accountability to and responsibilities for Gulf War veterans. At the same time, the SIU staff looked at the broader issues of the government's responsiveness to veterans' concerns and the ability of the DOD and VA to develop strong information and policy links. In the course of this investigation, the Committee held hearings in Washington and across the country. The SIU staff made numerous site visits to VA and DoD facilities, reviewed voluminous materials, and met with countless government employees, veteran service organization representatives, health professionals, scientists and researchers, and Gulf War veterans and their families. These investigative efforts by the SIU staff provided valuable insights into how to better prepare troops for future deployments, how to monitor troop health during deployments, and how to respond to veterans' health problems after those deployments.

Many veterans who served in Operations Desert Shield and Desert Storm are suffering from a range of physical disabilities, chronic ailments, and unexplained illnesses. In the period following the Gulf War, many ill Gulf veterans report having been told when they sought medical treatment that their ailments were "all in their heads." But, it is clear that many Gulf War veterans are suffering from very real physical problems, many of which are still evolving and the cause of which remains unclear. Effective treatments in many cases have yet to be identified, and even where treatment could be helpful, it is not uniformly provided to ill veterans. Veterans and their families are frightened about the long and short term consequences of these health problems. They are very concerned as to whether steps could have been taken before, during, and after the Gulf War deployment that might have prevented or minimized these health effects. They are concerned that lessons learned from the Gulf War will be applied in future conflicts to adequately warn and subsequently protect troops from avoidable environmental and manmade health risks. They also are concerned that individuals who develop health problems after serving in the Gulf War are encountering significant problems in obtaining adequate health care and timely compensation benefits from the government. Executive branch efforts, particularly on the part of the Departments of Defense and Veterans Affairs, that effectively address the problems described in this report are key to ensuring that Gulf War veterans get the help they need and to ensuring that veterans of future conflicts will not suffer the experiences of those from the Gulf War.

## KEY FINDINGS

The SIU's investigation found that the perception that no one in government is helping or is concerned about the health problems of Gulf War veterans had some merit in the past. This investigation also revealed that many of the concerns described above remain well-founded. The progress that might be expected given the passage of time, amounts of money spent, and programs put in place to assist ill Gulf War veterans is not what it should be. While there does not appear to be any single "Gulf War syndrome," there is a constellation of symptoms and illnesses whose cause or causes eludes explanation at this time. It is beyond the expertise of this investigation to draw firm conclusions on the many ongoing scientific debates as to the causes of Gulf War veterans' unexplained illnesses, and these inquiries likely will continue for many years. There is a great need to monitor those veterans who are ill, and who may become ill in the future, to assess whether they are getting better or worse and to define better the long-term health effects they may experience. And, there is a need to eliminate the continuing profound delays and bureaucratic hurdles that Gulf War veterans encounter in their attempts to obtain compensation benefits for health problems that appear to be connected to their Gulf War service.

The SIU's investigators found that there is insufficient evidence at this time to prove or disprove that there was an actual low level exposure of any troops to chemical weapon nerve agents or that any of the health effects some veterans are experiencing were caused by such exposure. There is reliable evidence that there were chemical weapons at least at one site, Khamisiyah, that was destroyed by U.S. troops during the Gulf War, although this fact was denied by U.S. officials for many years. These denials appear to be the result of a negligent failure to investigate the facts fully and promptly, but there is no evidence to date that they resulted from a concerted conspiracy of silence. There is also reliable evidence that one individual suffered injury from exposure to mustard agent. However, new information continues to surface about previously unknown aspects of the extent of Iraq's chemical weapons capabilities during the Gulf War. For example, in June 1998, United Nations weapons inspectors uncovered evidence that Iraq also had missile warheads containing the deadly nerve gas VX, a fact that Iraq up to that time had consistently denied. The SIU also found that the Department of Defense needs to improve substantially its ability to forecast, identify, and respond to a wide range of battlefield exposures that can trigger adverse health effects. Concurrently, the VA must be better prepared to deal with the consequences of a variety of battlefield exposures, including but not limited to chemical and biological agents, which may become evident in affected veterans years after such exposures occur. Moreover, veterans of the Gulf War—both those still on active duty and those who have separated from military service—continue to encounter serious obstacles to obtaining medical care that addresses their needs in an appropriate and timely way. Too often, the burden on the ill Gulf War veteran (and indeed, on any ill veteran) to successfully negotiate VA's often-confusing bureaucratic maze to obtain compensation benefits or health care services is overwhelming and a severe barrier to obtaining help. The areas where improvements are needed fall into the following four broad areas:

## I. Preparedness Shortfalls for Effective Defense Against Battlefield Hazards Existed Before and During the Gulf War and Continue Today

When examining the range of possible Gulf War troop exposures to substances in the environment that may have caused adverse health effects, it is important to keep in mind that no war is entirely analogous to an industrial accident. This is especially true in terms of the range of precautions that can be taken and the actions that can be expected of commanders or their troops when they are under fire or threat of attack. In hindsight, of course, many things are clear that could not have been foreseen at the time, but the lessons learned from the past should not be ignored. The threats that Gulf War troops faced from potential chemical or biological warfare and from exposure to environmental hazards were not new to the Gulf War. Much could have been done by the Department of Defense and the Department of Veterans Affairs to plan for, respond to, and minimize potential troop health risks from these factors. Despite lessons learned about readiness shortfalls during the Gulf War, the DOD still is not fully prepared to fight a war where the threat exists of exposure to chemical or biological weapons. And, in the words of a scientist who has studied the effects of depleted uranium and other battlefield exposures on Gulf War veterans' health, DOD needs to ensure that in deployments the military "stops doing stupid stuff" when using chemicals, solvents, pesticides, depleted uranium, and other substances that can cause adverse health effects in persons exposed to them. Moreover, much could have been done at the VA, (particularly given its past history with veterans exposed to ionizing radiation or Agent Orange) to respond much more effectively with comprehensive planning and prompt program implementation once reports of ill Gulf War veterans began to surface.

Good information, especially intelligence information, is critical to the success of any military operation. In the Gulf War, more effective intelligence analysis and dissemination would have aided the U.S. troops conducting demolition of the Khamisiyah weapons depot, which has been shown to have been a storage site for Iraqi munitions containing nerve agents. Weaknesses in information sharing, problems with coordinating information stored in multiple databases, and incomplete file searches were critical shortcomings that contributed to this problem. With good information in hand, U.S. military commanders and their troops could have acted to minimize the range of risks they faced and the aftermath of the destruction could have been carefully monitored. Moreover, the SIU found that the lack of access to good, timely information impeded scientists' attempts to reconstruct the Khamisiyah event once the DOD eventually acknowledged that it appears that chemical weapons had been destroyed there. However, even the best intelligence and information sharing does not guarantee that troops will not be faced with chemical or biological warfare on the battlefield. Troops need to be prepared to detect reliably the presence of chemical and biological weapons and to conduct effective military operations in an environment where chemical or biological weapons may be used. This investigation confirmed that U.S. forces did not have those capabilities at the time of the Gulf War, a shortcoming which has not been fully remedied today.

The SIU found that pre-deployment training for chemical and biological warfare was, and still is, inadequate. The industrial base on which the military relies to produce protective clothing,

detection equipment, and medical vaccines and antidotes, was and likely still would be slow to respond to the needs of a major deployment in which the threat of chemical or biological weapons use exists. These and other shortfalls in preparation and in equipment capabilities have contributed to apprehensions among Gulf War veterans about their health. For example, a large number of false alarms for chemical weapons agents were sounded by detection equipment that were known to be triggered by many common battlefield substances. The resulting confusion led many serving in the Gulf War theater to be uncertain as to whether these devices were in fact warning of the presence of chemical weapons. Steps have been taken to remedy these shortfalls and some improvements have been made. Much more needs to be done to ensure that troops are well trained in the use of detection equipment and protective clothing and in minimizing risks to themselves from other potentially toxic exposures to battlefield substances like depleted uranium.

The Department of Defense's failure to plan adequately for foreseeable problems is mirrored by many inadequacies in VA's dealings with ill Gulf War veterans. The SIU found that it is difficult for Gulf War veterans to comprehend and comply with the VA's complex and confusing rules and regulations for obtaining health care or compensation benefits. Within the VA there also is widespread misunderstanding of its own policies, programs, and processes related to Gulf War veterans. Some VA health care providers do not know what needs to be done when performing veterans' physical exams required for their participation in VA's Persian Gulf Registry. In addition, not all of VA's compensation benefits staff grasp what is required to process properly Gulf War-related compensation benefits claims. This situation has contributed to poor program planning and implementation across the board for Gulf War veterans.

Finally, a forward-looking approach to understanding, identifying, and treating health effects from potentially toxic environmental exposures is key to being prepared for troop illnesses that may follow future deployments. The mission of the Department of Defense is focused on war fighting; the Department of Veterans Affairs takes care of veterans after they leave military service. Neither, however, performs the basic public health function of observing, investigating, and preventing health problems that may arise in the context of war. To help address this, it is time to consider the need for and feasibility of a national center for the study of military health, with an emphasis on post-conflict health concerns and illnesses. Such a center could draw upon the best available scientific expertise from inside and outside of government to evaluate and monitor issues related to post-deployment health concerns such as outreach and risk communication, record keeping, research, utilization of new technologies, and health surveillance. In this inherently difficult yet important area of military health, research that is conducted before illnesses occur, not after the fact, can go far to ensuring prompt and effective medical treatment, to preventing adverse health effects in the first place, and in providing clear information to veterans who may be adversely affected by such exposures.

# INTRODUCTION

*"No one commits America's Armed Forces to a dangerous mission lightly . . . Standing up for our principles will not come easy. It may take time and possibly cost a great deal. But we are asking no more of anyone than of the brave young men and women of our Armed Forces and their families."*

*– Statement of the President addressing the Nation before sending U.S. troops to support Operation Desert Storm, August 8, 1990*

The President and his advisers understood the challenge facing American troops in August of 1990 and believed that the U.S. military was fully ready to meet that challenge. Tactically and strategically there was every reason to be confident. What no one knew was that some basic components of the American combat machine—specifically chemical and biological warfare readiness, health care readiness and monitoring, and health records management—were strained.

In the years following their deployment, many Gulf War veterans began reporting illnesses or health problems they believed were related to their service in the Gulf. As far as many of these veterans were concerned, neither the Department of Defense (DOD) nor the Department of Veterans Affairs (VA) was exercising appropriate diagnostic or prescriptive health care in response to their symptoms. The frustration many Gulf War veterans were experiencing from the inadequate responses of these two federal agencies was exacerbated by a troubling lack of health records from the war. In addition, information began circulating that suggested that there were events during the war which may have exposed some troops to health hazards yet were not fully documented in intelligence and operational records, had not been investigated, or were known but not acknowledged.

By 1992 and 1993, it was clear that there were problems with the way the Defense Department was telling the Gulf War story. It was also during this time that a new factor in the public exchange of information—the Internet—first became active. Web sites and chat rooms served as conduits for anecdotes, medical news, messages, exchanges of information that were sometimes factually correct and sometimes not, and simple pleas for help from Gulf War veterans and their families. There were stories of problems with the administration of a drug distributed to troops to lessen the effects of a chemical attack and accounts of faulty chemical weapons agent detection alarms.

Lacking any hard evidence to the contrary from DOD and doubting the limited information that was released by DOD and VA, veterans who were sick, the news media following their stories, and

others began using the newly-coined phrase "Gulf War Syndrome" to describe a growing list of physical symptoms many Gulf War veterans were experiencing. This concept of an unexplained but somehow linked set of illnesses caught the public's attention and brought the concerns of Gulf War veterans in the United States to the front pages of newspapers around the world. To many of these veterans who had been hailed in parades around the country, the Gulf War was no longer a singularly celebrated victory in the past—it had become an event with hazy and ominous dimensions for the future.

Congress soon took up the challenge and began to take action both to find out what had happened to veterans in the Gulf War that might have triggered their illnesses and to enact measures to provide them with medical and other assistance. For example, in 1993 and 1994 the Senate Banking Committee issued reports on its inquiry into U.S. exports in the 1980s to Iraq of materials that can be used in the manufacture of chemical and biological weapons and of possible links to Gulf War veterans' health problems. The Senate Committee on Veterans' Affairs took an early interest in the health problems that Gulf War veterans were developing and the government's responses, holding hearings, issuing reports, and sponsoring legislation. Committees of the House of Representatives have done the same.

Several other investigations into Gulf War veteran illnesses have also occurred or are still underway. Among these are studies carried out by a Defense Science Board panel in 1994 and by the Presidential Advisory Committee on Gulf War Veterans' Illnesses, which was established in May 1995 for an initial one year term and extended until October 1997. At the Department of Defense, the Office of the Special Assistant for Gulf War Illnesses was established in late 1996 and in February of 1997 the Director of Central Intelligence established the Persian Gulf War Illnesses Task Force to provide intelligence community support on questions related to possible chemical and biological incidents during the Gulf War. In April of 1998, the President established a Gulf War Advisory Board to conduct oversight of DOD's ongoing investigations into possible detections of and exposures to chemical or biological warfare agents and environmental or other factors that may have contributed to the illnesses of Gulf War veterans. Veterans service organizations and other non-governmental groups have also played key advocacy roles on behalf of ill Gulf War veterans. The reports and other products of all of these groups contain a broad spectrum of conclusions and opinions about the government's role and responsibility during the Gulf War for the subsequent health of that war's veterans.

And yet, despite many investigations and the passage of time, no clear understanding from an overall government perspective emerged as to what may have caused these veterans' illnesses, what should be done to treat them, and how a similar situation can be avoided in the future. To help bridge this gap, the Senate Committee on Veterans' Affairs created a bipartisan special investigation unit (SIU) in April of 1997 to undertake a comprehensive and detailed review of the situation.

What the SIU investigation found almost from the beginning was that the concept of a "syndrome," usually defined as "a group of symptoms that together are characteristic of a specific disorder, disease, or the like,"[1] does not accurately describe what is collectively referred to as "Gulf War illnesses." Instead, these veterans experience a variety of symptoms, illnesses, and disorders that do not appear to fit a particular pattern. Some of these medical personnel can readily identify; some defy conventional diagnosis. The SIU's approach to this situation was not unlike that of a news story, in which the basic questions explored are "who, what, when, where, why, and how?" For the purpose of this investigation that meant: who is sick; what is the nature of the illnesses, symptoms, or disabilities; when did they become sick; where did the illnesses or symptoms originate; why were avoidable health hazards in the Gulf not prevented; and how can the government best help Gulf War veterans now?

The SIU's defense-intelligence investigative team analyzed in detail the where, when, and why of Gulf War events, seeking links between the planning and operational side of the war and possible sources of health hazards. This team conducted an exhaustive survey of the equipment, policies, and information networks that surrounded and supported the troops in their various missions. It was through this part of the investigation that more was learned about the intelligence gaps, biological and chemical hazards training shortfalls, equipment deficits, and record-keeping shortcomings that led to possible health risk exposures. This evidence showed that certain specialized pieces of equipment designed to detect and warn of chemical weapons agents were not up to the task. It led the SIU to conclude that the Department of Defense at first neglected to fully investigate the destruction of a chemical weapons depot and later may have overstated the findings from its attempted computerized reconstruction of the event.

A second SIU team examined the VA's Gulf War health and benefits programs to determine the efficacy of the VA's examinations, diagnoses, and follow-on care, as well as the VA's procedures for determining benefits eligibility and claims adjudication. This team asked: "How did the VA initially respond to Gulf War veterans' health claims, is it doing a better job now, and will it be more responsive in the years to come?" The VA team learned that despite the VA's Gulf War registry and despite written policies for health care protocols for Gulf War examinations, data from the registry and exams often was not properly collected or analyzed during the years following the registry's establishment in 1993. The team conducted extensive in-field interviews and facility visits, and the results of its investigations reveal wide disparities among VA services with respect to appropriate care for Gulf War veterans.

This aspect of the investigation identified many shortcomings in the VA's health care and benefits delivery processes that have not served Gulf War veterans well from the earliest days of their complaints. Time and time again, the SIU's investigators found instances of poor judgement, inaccurate data, missing files, and bureaucratic barriers at VA medical centers and clinics that deprive Gulf War veterans in particular of timely and compassionate attention and treatment (although these problems at VA affect other veterans as well). While it would be unfair to paint all

VA facilities, staff, and managers with a broadly critical brush, some of the problems the investigators discovered call into question the ability of the VA to remedy its failures and provide proper care to Gulf War veterans.

The SIU's health-science team focused on the medical elements of this investigation—the morbidity, mortality, and epidemiology, or the who and what of the Gulf War illnesses story. This team looked at how DOD's health-related decisions prior to and during the Gulf War deployment may have affected the health of Gulf War veterans. They described what kinds of health threats Gulf War veterans could have encountered, including pesticides, oil well fire toxins, fumes from diesel engines and tent heaters, sand-fly-borne leishmaniasis, and potential reactions to vaccines as well as drugs such as pyridostigmine bromide. The team also described the health problems of Gulf War veterans and consulted with scientific experts to learn even more about how Gulf War exposures might be associated with illnesses. This team looked at how Gulf War veterans are being diagnosed and treated by DOD and VA, and what types of research are being funded to learn about reasons for these illnesses. Perhaps one of the most important lessons learned as a result of the health-science aspect of this investigation was how DOD's failure to keep records during the Gulf War is severely limiting the ability of researchers to learn more about these illnesses. The absence of good records also hampers the VA's ability to treat ill Gulf War veterans and to make the best possible benefits decisions for them.

The SIU completes its work with this report, but the Committee's oversight of this important issue will go on. This report represents a concerted effort to answer basic questions that have long been asked by Gulf War veterans, their families, Congress, and the public as to why these veterans are ill and, what is more important, how they can get better. This report comprehensively identifies weaknesses in the Defense Department's policies, plans, and procedures that may have caused Gulf War personnel to be exposed unnecessarily to certain health risks. It also identifies shortcomings in the VA's methods and policies for providing compensation benefits and health care to veterans of the war.

This report would be incomplete, however, if it did not commend the good work being done by so many dedicated men and women in VA, DOD, CIA, and other agencies and non-governmental groups, including veterans service organizations, who have worked and continue to work hard on behalf of Gulf War veterans. The investigative staff could not have accomplished all it did, in the time available, without the cooperation of countless individuals whose personal caring and professionalism are focused on relieving the anxiety, the pain, and the heartbreak evident among many Gulf War veterans and their families. The SIU equally owes a debt of gratitude to the many Gulf War veterans and their families who took the time to provide the investigation with invaluable information about their experiences. This report is for them.

# 1

# REVIEW OF DEFENSE DEPARTMENT AND INTELLIGENCE COMMUNITY ACTIONS, GULF WAR VETERANS' HEALTH, AND IMPLICATIONS FOR THE FUTURE

## INTRODUCTION

Key to determining why and how some Gulf War veterans have developed health problems since their deployment to the Middle East in 1990 is gaining an understanding of the state of U.S. military preparedness for conducting operations in that environment. Such an understanding must also be considered in the context of the perceived threat that Iraq might use chemical or biological weapons (CBW) in that war. Moreover, the lessons learned from that experience are critical to helping ensure that in the future no veteran's health is adversely affected during military service by circumstances that can reasonably be avoided or prevented.

In the fall of 1990, as American troops and allies began to arrive in the Persian Gulf region to initiate Operation Desert Shield, U.S. intelligence resources were already well aware of Iraq's ability to manufacture and use chemical and biological weapons. The news media was rife with speculation about the possibility of an Iraqi chemical weapons strike. There was good reason for this: the Iran-Iraq war during most of the 1980s left no doubt that given the opportunity, Iraq would employ chemical weapons on the battlefield. Awareness of the impact that chemical weapons could have on fighting forces had been an element of U.S. military training doctrine long before the Gulf War, but defense against chemical warfare had not been a priority during actual troop training.

The possibility that biological weapons could be used against coalition forces was also of concern to the U.S. government. While it was generally believed that chemical agents could be detected and, to some degree, countered, the United States' ability to detect biological weapons was almost nonexistent. Iraq's known chemical and biological production and storage facilities were, therefore, high on air strike priority lists.

By December of 1990, the likelihood of a ground war—and with it the possibility of chemical or biological warfare—triggered a decision to vaccinate some U.S. troops against anthrax. Department

of Defense and Food and Drug Administration officials were also developing guidelines for use of pyridostigmine bromide (PB), which was hoped would counter the effects of some chemical nerve agents, and for use of a botulinum toxoid vaccine. (For expanded information on these topics, see Chapter Three.) Fox vehicles, which are German-manufactured systems to detect the presence of chemical weapons, were brought into the theater during Operation Desert Shield. The M8A1 chemical alarm—a freestanding or vehicle mounted device—was also widely distributed throughout the region. Intelligence suggesting that Iraq could launch CBW-armed missiles into well-populated areas around the theater of operations heightened in-theater awareness of the need for good CBW protection.

Intelligence reports showed that Iraq had stockpiles of chemical and biological weapons scattered across the country. Strategies were developed by the Joint Chiefs of Staff (JCS) to attempt to neutralize as much of Iraq's chemical and biological production and capacity as possible during the Gulf War's air campaign phase, which began on January 17, 1991. The public was riveted by almost-real-time images of U.S. laser-guided munitions crashing into bunkers and other Iraqi military installations. These images, and reports of the destruction of Iraqi chemical and biological weapons production and storage sites, would again come under scrutiny many years later in attempts to reconstruct what happened during the war.

When the ground war finally got underway on February 24, 1991, the speed with which it was executed caused large numbers of U.S. troops to sweep through Iraqi defenses so fast they could not always fully account for what they had just encountered. An objective known to the military by one name often had another name to intelligence-gatherers, and yet another name that was commonly used by local residents. As a result, post-war cleanup plans, including those directing demolition team operations, were sometimes vague in details about specific areas to be cleared.

This chapter is built on several underlying findings. The first is that U.S. forces operating in the Southwest Asian theater during Desert Shield and Desert Storm were not always adequately supported by reliable or timely intelligence and communications. Good intelligence is a critical element both in the direct prosecution of war and in determining acceptable day-to-day operational risks for the soldiers, sailors, airmen, and Marines who may be called on to fight. This chapter's centerpiece case study, the demolition of the Khamisiyah ammunition complex in southeastern Iraq in March 1991, is an example of how intelligence and communications failures before, during, and after that event had not only the potential for placing U.S. personnel at an unacceptable level of risk, but in fact may have jeopardized the health of many American troops.

Even with the best intelligence, U.S. forces could still be faced with chemical or biological weapons or other materials (such as depleted uranium) with potentially hazardous side effects to those who use them or work around them on and off the battlefield. Therefore, the SIU investigation took a hard look at DOD's policies and plans for training, warning, and protecting troops from the hazards of such agents and materials. The results of this aspect of the investigation showed serious

training shortfalls in chemical and biological agent awareness and in other hazardous materials training doctrine. There were glaring deficits in the ability of fielded alarm systems to provide reliable warnings of impending chemical or biological agent exposures. There was poor medical record keeping with respect to potential health-risk exposures. And there was a critically inadequate supply of personal protection equipment available.

Finally, the SIU looked at record keeping as a tool for helping piece together events before, during and after the deployment. Such records can yield information relevant to veterans' health claims and can provide a scientific foundation for future health-risk research. The investigative staff found that the Department of Defense failed to maintain adequate records of critical health-risk events before, during, and after the Gulf War. This failure has brought into question for many the government's efforts to provide the best possible health care and benefits to Gulf War veterans. The failure to keep and maintain adequate records also undermines the ability of scientists to study a broad constellation of in-theater health risks with any degree of confidence in the available data.

In short, without good planning and sharing of intelligence, without adequate preparation in training and materials, and without adequate record keeping, neither the Department of Defense nor the Department of Veterans Affairs can adequately account for events or conditions that may ultimately have affected the health of Gulf War veterans or may affect veterans of conflicts in the future.

## THE KHAMISIYAH WEAPONS DEPOT DEMOLITION

The Khamisiyah weapons depot was a large facility in southern Iraq targeted for destruction by U.S. forces in early March of 1991. The story of Khamisiyah is one of confused location identities, inaccurate records, conflicting personal recollections, possible chemical exposure health risks, and claims of Pentagon cover-up after the fact. It illustrates issues common to many other events during the Gulf War. Following the narrative of the Khamisiyah incident is a discussion of other possible similar events, the effectiveness of chemical detection systems used at the time, and related battlefield health risk issues such as depleted uranium.

*March 2-4, 1991*—The Khamisiyah main depot complex (see maps reproduced at Appendix A) consisted of approximately 100 weapons storage bunkers distributed in an approximately nine square kilometer area and a smaller area—a kidney-shaped depression approximately 1,000 feet long and 300 feet across (widely referred to as the "pit") about two kilometers southwest of the larger complex. It is important to distinguish between the bunker and pit sites, since eyewitness accounts and contemporaneous intelligence reports did not always accurately describe the place and time of events in the Khamisiyah area in early March of 1991. Explosive ordnance disposal (EOD) teams from the 37th Engineer Battalion and the 307th Engineer Brigade arrived at the main bunker complex on March 2, 1991 with the purpose of investigating and demolishing what they believed at the time was one large weapons storage facility. The teams destroyed 37 bunkers in the main complex on

March 4. Prior to the detonations, troops from the 37th Engineer Battalion and the 307th Engineer Brigade inspected each bunker using M8A1 alarms designed to detect the presence of a range of chemical weapons agents, including mustard, sarin, tabun, and soman.[2]

**M8A1 CHEMICAL DETECTION ALARMS**

The M8A1 is a stand-alone or vehicle mounted device composed of a sensor and a horn which, when connected by a long wire, can be detached and set up some distance from the sensor. There has been considerable debate about the effectiveness of the M8A1, particularly in light of evidence that the device can be "tricked" into falsely sounding by a variety of non-lethal agents, such as diesel and turbine engine fumes, pesticides, and fine, wind-blown particulates. Only once during demolition activity on March 4, 1991 when the 37 bunkers were exploded in the main Khamisiyah depot did a M8A1 chemical alarm sound. The alarm caused many, although not all, of the units present to put on full chemical protection gear (also known as "Mission Oriented Protective Posture Level-4" or "MOPP-4"). Chemical protection training regulations require all military personnel to proceed to MOPP-4 when chemical alarms sound. However, many troops at Khamisiyah felt this was just one of numerous false alarms that had occurred since the war began and did not do so.

Some soldiers also conducted tests to confirm the presence of chemical agents using a device called the M-256-A1 Chemical Agent Detector Kit, a hand-held card containing a variety of reactive chemicals that respond to the presence of certain agents by changing color. One test showed a partial positive reading for "persistent blister agent" but additional tests with other kits led those using them to conclude that no chemical agent was in fact present.[3] Over the next six days the engineers prepared the depot for a final demolition of the entire facility.[4]

*March 9, 1991*—On March 9, 1991, during a second reconnaissance of the Khamisiyah depot and surrounding area, members of the 37th Engineer Battalion discovered stacks of 122mm rockets in the open pit-like area south of the main bunker complex. The rockets, covered by canvas tarps and dirt, were located along the pit's southwestern wall. Soldiers of the 37th, along with two explosive ordnance specialists, began preparing the pit for destruction. In the process, they opened crates that were found to contain "unmarked rockets colored olive drab," and they concluded that the rockets did not contain a chemical agent. This conclusion was based in part on the fact that M8A1 detectors that were used in the pit did not signal that any chemical agent was present.[5] Moreover, although members of the 37th Engineer Battalion had a general knowledge that chemical weapons could be present at any given site, as discussed below they were not equipped with timely information from intelligence sources that caused them to specifically look for such weapons at the Khamisiyah depot.

### CRITICAL SITE INFORMATION NOT PASSED TO DEMOLITION TEAM AT KHAMISIYAH

Information from human intelligence sources made available at the time to military decision-makers by the CIA warned of the possibility of chemical weapons in the Khamisiyah area.[6] A report of an interview with an Iraqi prisoner of war declared that chemical weapons were present at "Objective Gold," the name that the Army used to identify the Khamisiyah area.[7] The Khamisiyah site, this time referred to as "Tall al Lahm," also appeared on a "Suspect Chemical Weapons Site" list prepared by U. S. Central Command (CENTCOM). This list was provided to Army Central Command (ARCENT) as part of a request to determine by March 4 whether chemical or biological munitions were present at seventeen sites suspected to contain them.[8]

While this important intelligence was made available to military decision-makers, it is unclear to what extent any of this information reached the battalion, company, or unit level. For example, ARCENT failed to coordinate intelligence when an XVIII Airborne Corps message based on DIA information, dated 26 February 1991 and titled "Possible chemicals on OBJ. GOLD," was sent to the 24th Infantry Division Mechanized and the 101st Airborne Division. That data was not sent to the 82nd Airborne Division which was ultimately assigned to the demolition of Khamisiyah.[9]

Intelligence also conflicted as to whether Iraqi chemical munitions were or were not marked with any consistency. In February of 1991, messages were sent by the XVIII Airborne Corps and the 20th Engineer Brigade to subordinate commands notifying units that a particular color pattern or number of rings could identify chemical munitions.[10] SIU investigators learned that members of the 37th Engineer Battalion based their inspection of the bunkers and pit at Khamisiyah for chemical munitions on information consistent with this notification. These troops were not in the XVIII Airborne Corps chain of command and they did not receive a warning about the destruction of chemical ordnance published by the XVIII Airborne Corps on February 20, 1991. That warning stated that "at this time there are no known markings/color scheme on Iraqi chemical and biological munitions."[11] Another message sent by the CIA to DOD's intelligence (J-2) and operations (J-3) directorates in Riyadh through the Joint Intelligence Liaison Element on March 6, 1991 noted that the Iraqis in fact did not specifically mark munitions to indicate that they contain chemical agent. That message never reached the 37th Engineer Battalion.[12]

*March 9-10, 1991*—On March 9 and 10, 1991, soldiers of the 37th and the 307th set explosive charges among the cases of rockets in the pit at Khamisiyah. Due to the large size of the main Khamisiyah depot and other Iraqi munitions storage sites being destroyed, available supplies of demolition explosives usually used for such purposes were limited. This shortage caused the EOD personnel in the pit to resort to the use of a variety of foreign-made demolitions products, including Czech-supplied detonation cord. Affecting their actions were several considerations, including on-site evaluation that chemical weapons were not involved, the time constraints of the project (driven in part by command orders to conclude operations quickly and return home), and the limited supplies of explosives. In light of these, the engineers' goal was not to completely destroy the rockets but to

The IG report also stated that if low level exposure of troops did occur at Khamisiyah, it "was not of immediate military significance" and "was less than that necessary to cause an onset of acute physical symptoms."[15] There are grounds to support the Army Inspector General's findings that there does not appear to have been any direct evidence available at the time when the EOD teams were in the Khamisiyah pit indicating that chemical munitions were present. However, the IG's report is derived only from contemporaneous accounts of the Khamisiyah demolition and does not, for reasons that are unclear, also take into consideration information that had been generated from UNSCOM inspection team investigations of the area. As described below, UNSCOM's on-site investigations determined that sarin and cyclosarin in fact were present at Khamisiyah based on their on-site discovery in late 1991—some months after the demolition—of chemical-filled warheads and related debris.

## UNSCOM Concludes Chemical Weapons Were at Khamisiyah

As part of a broad internationally-sanctioned discovery process, United Nations Special Commission inspection teams visited Khamisiyah at least five times between October 1991 and August 1997. Their findings are summarized below:

*1991*—At the first inspection in October of 1991, UNSCOM found rockets at the Khamisiyah pit and determined that they contained a mixture of sarin and cyclosarin. UNSCOM inspectors tested at least one chemical rocket at that time and also noted the presence of over 300 more leaking and damaged rockets. According to UNSCOM, the chemical potency of the liquid in the warhead was so degraded it was necessary to place a sensitive detection device called a Chemical Agent Monitor just inches away from a leaking 122mm rocket in order to register a positive reading for the chemical agent sarin.

*1992*—UNSCOM inspectors discovered many rockets along the pit's south wall (sometimes described as a berm, or earthen retaining wall) that had been bulldozed by the Iraqis some time after the previous inspection.

*1993*—UNSCOM inspectors shipped about 500 rockets from Khamisiyah to a destruction facility at Al Muthanna, where they were drained of sarin/cyclosarin and then demilitarized.

*1996*—In May of 1996, UNSCOM found plastic burster tubes, which are components of munitions containing chemical agent, and other evidence that chemical rockets had been in a main depot bunker that was destroyed by U.S. forces on March 4, 1991, a week before the pit explosion.

*1997*—In August of 1997, another inspection of the bunker discovered in 1996 revealed that more sarin-filled rockets remain buried underground at that site.

## UNSCOM RATES IRAQ CW SARIN PURITY AS HIGH AS 75 PERCENT

Based on Iraqi production documents found by UNSCOM during an inspection of the Al Muthanna chemical weapons production and storage facility in Iraq, the purity of Iraqi sarin produced during the Gulf War ranged from 40 percent to 75 percent. During their follow-on investigations in Iraq, UNSCOM teams found and tested a number of 122mm rockets found at the Khamisiyah pit. Determining the chemical's purity several months or years after the Khamisiyah event provides clues as to the potential lethality of the weapons at the time of destruction. Many factors, including temperature, humidity, type and size of container, and storage procedures, can affect the quality of a chemical agent. Based on available evidence, the SIU investigators could not draw specific conclusions about the potential lethality of any of the chemical-filled rockets discovered at Khamisiyah. However, according to UNSCOM, the purity of the sarin/cyclosarin mixture in the 122mm rockets found at Khamisiyah that were filled in December of 1990 was about 60 percent. Iraqi chemical production records recovered by UNSCOM indicate that this chemical agent was part of a production run of about 60 tons of sarin/cyclosarin that was placed into over 8,000 122mm shells. UNSCOM's officials estimated the purity of the agent at the time of the demolition of Khamisiyah was about 50 percent.[16]

UNSCOM authorities found that Iraq shipped, either by rail or truck, 2,160 122mm rockets to Khamisiyah in early January of 1991 and stored half of them in a bunker that subsequently was destroyed on March 4 by U.S. troops. Sometime between January 10 and January 15, the other half of that cache was moved to the pit area.[17] The Iraqis have provided two explanations for the movement of these munitions to Khamisiyah: (1) they were moved for safety reasons because the rockets were leaking and (2) they were moved to avoid being destroyed by bombing during the Gulf War itself.[18] UNSCOM personnel also told SIU staff that the Iraqis have recently declared that the rockets were initially stored in two bunkers.[19] However, UNSCOM inspectors have not been able to find another bunker at Khamisiyah that confirms this.

UNSCOM also learned that in January of 1991 Iraq moved over 6,000 mustard-filled 155mm-artillery shells to the An Nasiriyah ammunition storage area, located approximately 30km northwest of Khamisiyah. They were part of a group of 13,500 projectiles that were filled with mustard in 1990, with a purity that ranged from 85 to 90 percent. U.S. intelligence sources stated that sometime in January or February the munitions were transferred to an area outside of Khamisiyah and covered to avoid overhead detection. However, these munitions were neither found nor destroyed by U.S. personnel in the area. The Iraqis showed members of the October 1991 UNSCOM inspection team these mustard-filled shells. All of the shells were eventually transferred by UNSCOM to Al Muthanna for destruction.

Much, if not all, of the controversy that has surrounded the demolition of Khamisiyah likely could have been avoided had the Department of Defense and the intelligence community thoroughly investigated the information available about it in 1991. The following chronology, derived from

unclassified documents and government publications, details information available inside the U.S. government about Khamisiyah in 1991:

*April 1991*—The U.S. government intercepted an Iraqi report claiming U.S. forces had destroyed the Khamisiyah depot on April 1 and 2. The Iraqi information was incorrect; the report referred to the destruction of the 37 bunkers in the main Khamisiyah depot on March 4, 1991.

*May 16, 1991*—Iraq declared to the United Nations that 2,160 sarin-filled rockets had been destroyed at "Khamisiyah stores" and 6,240 mustard-filled 155mm-artillery shells remained intact at "Khamisiyah stores."

*May 17, 1991*—Iraq gave the location of "Khamisiyah stores (Nasiriyah)" at 3046N/04630E, which is near Khamisiyah. This declaration was widely distributed inside the State Department, the Department of Defense, and the intelligence community.[20]

*August 1991*—The CIA published a highly classified intelligence assessment on Iraqi noncompliance with UN Security Council resolutions that listed Khamisiyah as a known CW storage site.[21]

*October 1991*—The UNSCOM inspection team was led by Iraqis to a number of 122mm Iraqi sarin/cyclosarin rockets in a pit near Khamisiyah and over 6,000 155mm mustard rounds in an open area west of Khamisiyah. These were the same shells that had been initially transported to An Nasiriyah in January 1991. The Iraqis also told the inspectors that coalition troops had destroyed chemical weapons in a bunker at Khamisiyah earlier that year.

*November 1991*—The UNSCOM report was made available to the DIA, but it was dismissed as containing Iraqi deception for two reasons: (1) confusion over whether or not the inspectors were actually taken to Khamisiyah or the depot nearby at An Nasiriyah and (2) a belief that the Iraqis may have placed the chemical weapons there as part of an effort to conceal their chemical and biological weapons programs.[22]

The Arms Control Intelligence Staff (ACIS), which was the intelligence community's interagency coordinating organization at the time, disseminated a report throughout the intelligence community and the Department of Defense that included Iraqi claims about the destruction of Khamisiyah. That same month, ACIS distributed an internal CIA cable that described the demolition, identified Khamisiyah as being the same site as one known within the intelligence community during the Gulf War as Tall Al Lahm, and reported that Army Central Command had provided information placing the 24th Mechanized Infantry Division near Tall Al Lahm. Remnants of U.S.-manufactured and deployed M-48 shaped charges had been recovered at the site, indicating that American forces had been present during the destruction. ACIS sent a message to the 24th Mechanized Division advising them about Khamisiyah and asking if their troops were involved in the demolition. The 24th

Mechanized Division did not respond to the message, although it is unclear why, and ACIS failed to follow-up.[23]

### MISIDENTIFICATION OF KHAMISIYAH SITE KEY TO INTELLIGENCE CONFUSION

The fact that the area now referred to as Khamisiyah had been commonly identified within the intelligence community as Tall al Lahm appears to have been a key factor hindering timely dissemination and use of intelligence information about the area. Tall al Lahm refers to another town just west of the ammunition storage area. The Iraqis referred to the area as Khamisiyah, a somewhat larger town east of the facility. To the 37th Engineer Battalion, it was known as Objective Gold. However, the National Security Agency database referred to the area as Al Khamisiyah.

The lack of coordination of names and data bases concerning Khamisiyah led to confusion about who destroyed the depot, whether or not it was a chemical weapons site and if the site was truly Khamisiyah or An Nasiriyah. The Central Intelligence Agency has acknowledged these shortcomings and has made a number of recommendations regarding shared use of a primary database for location names and spellings, development of which should be a priority to help avoid similar mistakes in the future.[24]

### EXTERNAL PRESSURES PROMPTED U.S. GOVERNMENT INVESTIGATION INTO KHAMISIYAH

The information about the events at Khamisiyah described above only recently came to light because of pressure from veterans, Congressional investigations, the media, and others. The following chronology describes actions taken by the U.S. government as a result of that pressure:

*March 1995*—The CIA was directed to conduct a thorough review of intelligence during the Gulf War.

*May 25, 1995*—The Presidential Advisory Committee on Gulf War Veterans' Illnesses (PAC) was established.

*September 1995*—The CIA reported to the DOD Persian Gulf Investigation Team (PGIT) that the Khamisiyah demolition was a possible chemical release event. The report was based on a review of the 1991 UNSCOM report on Khamisiyah and the development of a comprehensive summary of Iraqi chemical weapon production and storage facilities. A search was made of the newly-constructed DOD Environmental Support Group (ESG) unit locator database to find units that were located in and around Khamisiyah in early March 1991.

*October 1995*—The PGIT reported that the ESG unit locator database search revealed that the 37th Engineer Battalion had reported its location in March 1991 at coordinates near Khamisiyah.

However, the PGIT was unaware that the mission of the 37th Engineer Battalion had been to search out and destroy weapons stockpiles and did not conduct a follow-up investigation.[25]

*January 1996*—Khamisiyah was mentioned by the CIA as a possible chemical weapons storage and release site during a briefing to the National Security Council staff. The National Security Council staff directed that CIA and the Department of Defense work together to pursue this issue aggressively. Further information linking U.S. military personnel to the destruction of chemical weapons was uncovered, including imagery that revealed bunkers at Khamisiyah had been destroyed between March 1 and March 8, 1991 and cables indicating that UNSCOM inspectors found evidence of U.S. demolition charges at Khamisiyah.

*March 10, 1996*—A definitive connection was made five years to the day after the Khamisiyah "pit" demolition when a CIA analyst heard a tape recording of a radio show during which a veteran who had been with the 37th Engineer Battalion at Khamisiyah described the demolition of an Iraqi facility.[26]

*March 19, 1996*—CIA and DOD officials met with UNSCOM personnel to discuss Gulf War illnesses issues. At the meeting UNSCOM mentioned its intent to revisit Khamisiyah. UNSCOM reinspected Khamisiyah in May 1996 and found high-density polyethylene inserts, burster tubes and fill plugs which are used in chemical weapons and whose presence suggested that chemical rockets were destroyed when the bunker was exploded on March 4, 1991.[27]

*June 21, 1996*—After five years of insisting that no chemical weapons had been deployed by Iraq during the Gulf War, DOD publicly announced that in fact chemical weapons had been present at least at Khamisiyah and that it was a site that had been destroyed by U.S. troops.

*September 25, 1996*—A joint hearing of the Senate Committee on Veterans Affairs and the Senate Select Committee on Intelligence on the Khamisiyah incident was held.

*November 1996*—The Secretary of Defense created the Office of the Special Assistant for Gulf War Illnesses (OSAGWI).

## INTELLIGENCE OPERATIONS SCRUTINIZED

In order to determine the adequacy of the intelligence provided to the troops at Khamisiyah, it was necessary first to investigate how intelligence was provided to our troops during the Gulf War. Before the Gulf War deployment in 1990, approximately 200 people, including DIA and contractor support, staffed the J-2 Intelligence Directorate at CENTCOM headquarters at McDill Air Force Base in Tampa, Florida. Beginning in April 1990 there was increasing concern about activities in Iraq and by July, the J-2 believed that Iraq was on the verge of invading Kuwait.[28] At CIA, the National Intelligence Officer for Warning also reported that Iraq was likely to invade Kuwait.

## INTELLIGENCE OPERATIONS WERE NOT FULLY INTEGRATED AND COORDINATED

Within days of the August 2, 1990 Iraqi invasion of Kuwait, a National Joint Intelligence Center (NJIC) was established in the Pentagon to coordinate intelligence operations between CENTCOM and the intelligence community in Washington. The NJIC operation included representatives from the Joint Chiefs of Staff, National Security Agency, Defense Intelligence Agency, and imagery and other intelligence community collection entities, but the Central Intelligence Agency initially refused a desk at NJIC. Later, the CIA became part of the team, but continued to operate separately from its headquarters in Langley, Virginia, instead of with NJIC at the Pentagon.

## CIA, JOINT INTELLIGENCE LIAISON ELEMENT NOT PLUGGED-IN TO ALL INTELLIGENCE OPERATIONS

This lack of coordination of intelligence assets also occurred in the Gulf. The CENTCOM Joint Intelligence Center (JIC) in Riyadh, Saudi Arabia consisted of a variety of subgroups, including Operations, Targeting/Bomb Damage Assessment, Collections, DIA, and CIA. However, CIA intelligence personnel also operated out of a Joint Intelligence Liaison Element (JILE) in Riyadh. Further, the CIA senior representative to CENTCOM never went to the Gulf. Instead, the JILE chief became the senior representative from the CIA. The JILE representative was rotated into and out of the Gulf every thirty days, affecting information continuity. All these circumstances adversely affected the CIA's relationship with intelligence operatives at headquarters in Riyadh.[29] To further complicate intelligence coordination, military operations support also came in the form of eleven National Military Intelligence Support Teams (NMIST) comprised of intelligence officers from the various commands supporting CENTCOM.[30] Thus, the quality of intelligence coordination and effectiveness between the J-2 and the services depended on the services' input and the ability of the particular military personnel assigned to the J-2.[31] The result was that the J-2 should have been the focal point for intelligence information, but was not. (See diagram at Figure 1.)

## JOINT AGENCY EFFORTS BEGIN TO RESURRECT GULF WAR INTELLIGENCE

Since the Pentagon announcement in June of 1996 that U.S. military personnel may have been exposed to chemical warfare agents as a result of the Khamisiyah demolition, the CIA Persian Gulf Illness Task Force, OSAGWI, the Army Inspector General, the CIA Inspector General, and DOD's Office of Intelligence Oversight all have been tasked to retrieve and reconstruct the intelligence available about Khamisiyah to the 37th Engineer Battalion at the time of the demolition. As part of this effort, the CIA and DIA have declassified numerous previously highly classified documents about Khamisiyah.

From these efforts, it appears that intelligence support for this incident fell into three categories: (1) intelligence about Khamisiyah as a potential chemical weapons site; (2) intelligence community

## DOD/OSAGWI-CIA ATTEMPTS TO RECONSTRUCT KHAMISIYAH

### BACKGROUND

Once DOD and CIA acknowledged the likelihood that chemical agents were present in some Iraqi weapons destroyed by U.S. forces, questions remained as to whether American personnel were actually exposed to any agent that might have been released during that destruction. DOD, through the Office of the Special Assistant for Gulf War Illnesses, and the CIA jointly produced and distributed a "plume" analysis of the March 10, 1991 pit demolition that represented what OSAGWI officials call "the worst case scenario" to try to determine whether any troops might have been exposed to some level of chemical agent and what level of exposure might have occurred.

What DOD and CIA label as a "plume," and what this report will also refer to by that term, is not a cloud of material that was ever actually observed at the time or can be definitively shown to have existed. It is a mathematically derived computer model used to produce a theory of what may have occurred when the chemical-filled rockets were destroyed at Khamisiyah. It should not be confused with the large clouds of smoke and debris rising above the large Khamisiyah munitions depot and the smaller rocket-filled pit when the various explosive charges were detonated as reported in numerous anecdotal eyewitness reports. From all accounts, the visual effect was dramatic, even from a distance of 10-15 km. The main depot, a complex several square kilometers in size, went up in spectacular fashion, with smoke rising high enough to be described as covering a good portion of the sky.[36] Eyewitness accounts of the smaller pit explosion—timed to begin in synch with the main depot's destruction—describe a significant cloud rising over the site, with rockets "cooking off" and flying out of the pit as their motors ignited from the concussions and heat of the explosive charges set on other rockets.

For the most part, these reports describe the short-term effects of the demolition process viewed from a distance. However, they do not accurately describe what could have happened to any chemical warfare agents released by the demolition. The Khamisiyah plume should also not be compared to the smoke plumes associated with the oil well fires. Those were the visible, well-documented, and long-lasting effects of Iraqi sabotage. In contrast, there were no on-site, immediate, and accurate measurements of releases from the Khamisiyah pit detonation. The absence of such data makes it necessary to rely on reconstructed weather and other data collected at the time to produce a theory as to what may have occurred when the chemical-filled rockets were destroyed.

The DOD/CIA modelers found, and the SIU's investigators concur, that as a result of the detonation some portion of the chemicals would have been instantly burned and vaporized. Some amount would have been aerosolized and sprayed into the atmosphere. Some of the sarin/cyclosarin would simply spill out on the ground and would be absorbed either into the ground or the debris from the explosion. That portion of the chemicals released into the atmosphere by the force of the explosion would become subject to the dynamics of wind and other meteorological conditions

prevailing in the region. Rainstorms which were recorded as passing across the air mass bearing the airborne chemicals would have diluted that vapor cloud; cooler night air would have brought the plume closer to the ground, while warming morning air would add buoyancy to the plume and drive it back up into the atmosphere. Atmospheric pressure, variations in humidity and dew point, moisture on the ground, even heat and light reflections from sand and rocks, would influence not just the path of the plume. They would also affect chemical changes occurring within the plume. In particular, sarin is a substance that although initially lethal is unstable and degrades rapidly once exposed to the open air.

Four contractors and a team of CIA-sponsored scientists experienced in plume analysis developed and presented five separate plume results based on generally accepted transport and diffusion models.[37] The models were created with only the simplest of detonation and chemical source assumptions and somewhat limited historical meteorological data depicting generalized atmospheric conditions for the March 10-12, 1991 period of the detonation. The various diagrams and depictions of the Khamisiyah plume model that were produced are wholly computer-generated images that were never confirmed by on-site, real-time observations. This computer model analysis was made public on July 22, 1997, in time for the Presidential Advisory Committee on Gulf War Veterans' Illnesses (PAC) to include the results in its report released in October of that year. (This model is reproduced at Appendix B.)

**"SUPER PLUME" OF ALL FIVE MODELS DEVELOPED TO SHOW "WORST CASE SCENARIO"**

In the published analysis, the results from all five plume models were overlapped and the outermost perimeter of the resulting "super plume" was used to mark the maximum possible boundary of chemical exposure potential. (See Figure 2.) This "union" model was selected over one that showed the "intersection" of the five plumes, which would be a region smaller than that of the union model but include an area common to all five plume models. The resulting area indicated by the "super plume" was compared to unit locations supplied by the U.S. Army Center for Health Promotion and Preventive Medicine (USACHPPM). Based on this information, assumptions were made as to which troops were located in the area indicated by the "super plume" model during the three-day period after the Khamisiyah demolition and who might have potentially come into some contact at any level with chemical agent. In turn, letters were sent by OSAGWI to at least 100,000 Gulf War veterans advising them of a potential for a low-level exposure to chemical weapons agents released during the destruction of the Khamisiyah pit area. (See copy of letter at Appendix C.) The language contained in the OSAGWI letter to veterans was noncommittal, only suggesting that low level exposure of those who received it was a possibility but making no more definite statements than that.

Direct Connection

# 2

# ASSESSMENT OF GULF WAR VETERANS' HEALTH CARE SERVICES AND COMPENSATION BENEFITS AT THE DEPARTMENT OF VETERANS AFFAIRS

## INTRODUCTION

The relationship between the Department of Defense and the Department of Veterans Affairs is as important today as it has ever been. With the winding down of the Gulf War in 1991 and the concurrent downsizing of U.S. forces world-wide, the number of men and women who are veterans eligible for VA care is significant. In taking a close look at the Department of Veterans Affairs and its role in ensuring the health and well-being of Gulf War veterans, the staff of the Special Investigation Unit traveled to numerous VA facilities across the country. (The VA facilities visited by the SIU can be found at Appendix J.) This effort included examining the VA's capabilities and plans for the care of Gulf War veterans, and ways in which the VA and DOD can work together to ensure that Gulf War veterans get the care and services they deserve. In conducting this investigation, the SIU examined the nature and extent of the health care services currently provided by VA to Gulf War veterans. The SIU also studied how VA's claims processing centers across the country (known as regional offices) review Gulf War veterans' compensation benefits claims and how VA ensures that those decisions are timely and accurate.

However, as this chapter describes, too many Gulf War veterans are dissatisfied with the health care they are receiving from VA. And, too few of those veterans currently are receiving timely responses to their claims or accurate determinations of whether a grant of compensation is warranted. The SIU found that although the VA purports to operate as a single entity on behalf of veterans, in practice it is a loosely linked group of bureaucracies that operate largely in isolation from one another. This organizational structure breeds communication lapses and bureaucratic hurdles that prevent the VA from providing effective and efficient service to Gulf War veterans.

The purpose of this chapter is to identify opportunities for improvement. In that vein, the SIU identified three key areas of concern that are common to the disability compensation and benefits programs administered by the Veterans' Benefits Administration and the health care services

provided by the Veterans Health Administration. This chapter's discussion of the SIU's investigation into VA's activities on behalf of Gulf War veterans should be read with the three issues set out below in mind.

First, there is a clear absence of a common philosophy and a practical approach to VA procedures, programs, processes, and policies related to Gulf War veterans. On the health care side, for example, there is no clear guidance for VA's medical staff for conducting standardized and thorough Persian Gulf Registry exams, while on the benefits side there appears to be a lack of understanding as to the proper standards to apply in processing Gulf War-related compensation benefits claims.

A second major problem common to VHA and VBA is the chronic failure within VA to adequately collect, analyze, and share information about Gulf War veterans who seek assistance from the VA. Without such basic cooperation and sharing of data, there can be no reliable evaluation of how the VA's Gulf War programs and policies are working. Without reliable evaluation of the programs, it is impossible for VA leadership to make necessary adjustments or respond to changing conditions. An inability to reliably evaluate the VA's legislatively mandated Gulf War programs means that Congress's oversight responsibilities are seriously impaired. Most importantly, absent reliable data and program evaluation it is impossible to ensure that individual Gulf War veterans are receiving appropriate health care treatment or that their compensation benefits claims are being processed in an accurate, consistent and timely manner.

Third, there is a pervasive lack of coordination at VA of the various services it has available for Gulf War veterans. This is not limited to programs for Gulf War veterans, for the VA already has identified coordination defects as an agency-wide problem affecting all veterans. However, the VA's solution to date largely has been to coin and repeat the slogan "One-VA." A VA that truly operates as a single entity should, of course, strive to speak with one voice. Unfortunately, this rhetoric all too often replaces effective action and insofar as Gulf War veterans are concerned, VA's mission remains unfocused. The result is internal agency conflicts, program insularity, and confusion and frustration on the part of the Gulf War veterans that the agency says are a priority for it to serve. Each of the problems identified here can be remedied. In some cases it will require a substantial commitment of VA's part to do so; in other cases progress is already being made. However, these weaknesses in VA's Gulf War veteran programs cannot, and should not, be ignored, for to do so would be to renege on this nation's commitment to help ill Gulf War veterans to the greatest extent possible.

## OVERVIEW OF VA'S RESPONSIBILITIES TOWARD GULF WAR VETERANS

The government's responsibility to take care of individuals who serve in the defense of the United States and are injured as a result of that service can be traced to laws enacted by the Plymouth

Colony.[97] Caring for the war-wounded is as deeply ingrained in our nation's traditions as are voting and community service. Since the beginnings of our country, some measure of compensation from the government for disabled veterans has been available.

Qualifying for VA health care services or disability compensation benefits is not automatic. It requires that the veteran provide proof to VA that an injury or health condition was triggered by something that happened during the veteran's military service. Yet, as this investigation discovered, determinations of eligibility for health care services and for disability compensation benefits do not operate in a parallel fashion. This is particularly true for Gulf War veterans with unexplained illnesses or, as VA refers to them, "undiagnosed illnesses." Where compensation claims from Gulf War veterans who suffer from undiagnosed illnesses are involved, the adjudication of those claims often is a long, laborious, and complicated process. This is partly due to the unique issues raised by the possible connection between Gulf War service and the current health problems of some of those veterans for which a cause has not been determined. Also, as described in this chapter, the problems that exist in the delivery of health care services and compensation benefits are also a consequence of organizational priorities that were established at VA without providing personnel with adequate training, information and time to accomplish them. The situation is confounded by the fact that there is little coordination between VA's health and benefits components on Gulf War veterans' issues.

In the past few years, those in leadership positions at the VA have often described the department's overall performance goals in terms of a "One-VA" model—meaning that all parts of the agency, and particularly the benefits and health care areas, will work in unison for the maximum benefit of the department's customer, the veteran. VA leaders cite many examples of the success of the "One-VA" approach, including initiatives involving Gulf War veterans, and in recent years some positive changes have occurred. For example, teamwork between VA health care and compensation experts resulted in regulations to provide Gulf War veterans with undiagnosed illnesses compensation payments. However, in spite of this success story, the SIU's investigation found little evidence that VA's claims of a streamlined and more efficient approach to fulfilling its mission are reflected in VA's actual delivery of timely health care services and disability compensation to veterans, particularly where Gulf War veterans are concerned.

Although senior-level officials at VA, as at any organization, are responsible for implementing the policies they establish or articulate, the SIU found that a lack of internal oversight of VA programs is common and a lack of accountability the status quo. As the discussion below demonstrates, there unfortunately is little evidence that VA leaders are moving forward to implement fundamental changes in the department's administrative, organizational, or service delivery structures that truly embody a unified "One-VA" approach to the delivery of services to Gulf War veterans seeking care and compensation.

## LACK OF COOPERATION BETWEEN VA'S HEALTH AND BENEFITS ADMINISTRATIONS HINDERS IMPLEMENTATION OF THE "ONE-VA" APPROACH

This investigation found that there are serious impediments to cooperation within VA, especially between the health and benefits administrations. This situation exists not because VA lacks the expertise necessary to fully understand and address the undiagnosed illnesses suffered by Gulf War veterans. It exists because the expertise and resources are fragmented. The Veterans Health Administration (VHA) has consistently failed to follow and track the progress of treatment of Gulf War veterans, even those who are service-connected for undiagnosed illness and who are categorized among VA's priority customers. Similarly, as correspondence from officials at the Veterans Benefits Administration (VBA) to the Committee has acknowledged, VBA has failed to maintain or provide records accounting for its use of resources to adjudicate claims from Gulf war veterans.[98]

In VBA, policy guidance on Gulf War claims processing is provided to decision makers at VBA regional offices around the country from VA headquarters (known within VA as the "Central Office") by a team of policy and claims management experts called the Rapid Response Team. Rapid Response Team members respond to questions from regional office decision-making personnel concerning the adequacy of evidence presented in support of a compensation claim, including the physical examinations of veterans that are performed by VHA doctors on behalf of VBA. Yet, even though it is VHA doctors who have expertise regarding the conduct of these physical examinations, VBA's Rapid Response Team as of the writing of this report does not include among its personnel either a VHA Central Office Gulf War expert or any other VHA health care policy expert. Perhaps this is merely an oversight on VBA's part. Nevertheless, the SIU's investigators believe that this failure by VBA to take advantage of VHA's expertise in this way is a lost opportunity to help unify VA's approach to how Gulf War veterans' compensation claims are processed.

The lack of cooperative policy making between VBA and VHA was recently addressed in part by the joint issuance in February of 1998 of fully informed, basic guidance to VA's regional offices and medical facilities in the field. This guidance describes how to conduct physical examinations in support of Gulf War veterans' compensation claims for undiagnosed illnesses. It also addresses issues of fundamental concern such as to what extent a claimed condition should be investigated before being judged to be "undiagnosed." [99] This example illustrates the extent to which the "One -VA" concept easily could be realized in the day-to-day operations of VA where Gulf War veterans are concerned. That Gulf War veterans should be able to deal with "One-VA" is not only good policy, but it is necessary if VA is to provide adequate service to Gulf War veterans.

## VA DISABILITY COMPENSATION AND THE GULF WAR VETERAN

In order to fully understand the problems Gulf War veterans are facing in obtaining timely compensation from VA, it is necessary to understand how the compensation claims system at VA is intended to work.

*Service-connection for Disabilities and "Undiagnosed Illnesses"*

The term "service connection" is used at VA, in the context of adjudicating compensation claims from any veteran (including Gulf War veterans), to refer to injuries incurred or diseases contracted during military duty or, if the injury or disease existed prior to service, for conditions aggravated by military service. "Disability compensation" is the monthly payment made by VA to a veteran who has been found, after the veteran has filed a claim and it has been resolved in the veteran's favor, to be disabled as the result of military service if that disability is found to be "ten percent" or more. At VA, the percentage of disability is derived from a regulatory "Schedule for Rating Disabilities." [100] This schedule contains ten grades, or percentages, of disability upon which compensation is paid. When a disability is determined to be service-connected, the percentage of disability assigned for the condition is based upon the average impairment of earning capacity resulting from the same injury in civil occupations.[101]

Under existing law, there are two ways in which veterans may establish service connection for a disability. These are called "direct service connection" and "presumptive service connection." "Direct service connection" means that the facts in a veteran's claims record establish that an injury or disease resulting in a chronic disability, which VA defines as one that has existed for at least six months, was incurred coincident with military service. Direct service connection can also be shown even though a physical condition existed prior to military service if the facts in the veteran's claims record demonstrate that the condition was aggravated by military service.[102] In cases of "presumptive service connection," an adverse physical condition may be presumed by law to be related to military service, even if it is not shown to have occurred during or was aggravated by that service, if the chronic disability is manifested to a degree of ten percent or more within a certain time limit (usually within one year after the veteran was released from military duty). Presumptive service connection has the advantage of simplicity for the veteran and VA because it does not require documentary proof that the disability occurred in military service.[103]

A precondition to successfully applying either of these two methods for establishing service connection is a diagnosis attached to the condition that the veteran claims is related to military service and is one for which compensation should be paid. However, many Gulf War veterans suffer from ill-defined symptoms and from symptoms that elude classic diagnostic processes. Therefore, Gulf War veterans are at a disadvantage under the conventional measures of service connection that require a diagnosis.

In order to take into account the unique character of Gulf War veterans' unexplained illnesses, statutory language was enacted in November 1994 providing that presumptive service connection may be granted to Gulf War veterans who are sick from illnesses that cannot be diagnosed.[104] Under this provision, service connection is to be granted when the Gulf War veteran suffers from a chronic disability resulting from one or more undiagnosed illnesses. The undiagnosed illness must have manifested itself during the veteran's active duty in the Southwest Asia theater of operations during

the Gulf War, or to a degree of ten percent or more disabling from the date the individual left the Southwest Asia theater through December 31, 2001.[105]

*Processing of Gulf War Veterans' Compensation Claims*

The claims process begins with the veteran's completion of an application for disability benefits. When any veteran files a claim for compensation, that individual must diligently track the claim's status in order to get a timely and favorable result. According to VA regulations, the veteran is responsible for furnishing evidence supporting his or her claim. VA personnel in regional offices take the lead in the remainder of the process, sometimes assisted by representatives from veterans service organizations such as the American Legion, Disabled American Veterans, or Veterans of Foreign Wars. VA is responsible for identifying, gathering, and deciding whether sufficient proof has been assembled to result in a favorable determination that the Gulf War veteran's claimed health condition is service-connected. While VA is required to assist the veteran in developing the facts of the claim, the regulations also state that the requirement that the VA assist a veteran does not shift the ultimate responsibility to produce supporting evidence for the claim from the veteran to VA.[106]

VBA's regional offices are the hub of the adjudication process for any compensation claim, including those filed by Gulf War veterans. Regional office personnel who review the veteran's claims record identify and gather evidence to determine what issues should be considered in deciding a claim. They also evaluate all the available evidence to rule on the veteran's eligibility to receive disability compensation. VA compensation decision makers must examine all the evidence in a veteran's record to address conditions that are specifically claimed as service-connected.[107] However, these same decision makers are also responsible for identifying issues that are not specifically claimed by the veteran but that are "inferred" from the face of the record. Inferred issues in this context are signs or symptoms that are unrelated to a diagnosis but nevertheless are evident upon review of the veteran's record.[108] In other words, within each claim by a veteran there may be inferred issues that must be considered for service connection in the same manner that claimed issues must be considered. This is especially important for Gulf War veterans with undiagnosed illnesses, because VA's criteria for compensation for undiagnosed illnesses provides that service connection is payable to a Gulf War veteran who exhibits indications of a chronic disability manifested by one or more signs or symptoms such as fatigue, muscle pain, abnormal weight loss, or menstrual disorders.[109]

Thus, for any veteran to obtain a determination that he or she is entitled to compensation payments two threshold requirements must be met. First, a link must be established or presumed between the veteran's military service and the claimed or inferred condition. Second, the VA compensation decision-maker must find that the service-connected condition is at least ten percent disabling.

## VA HEALTH CARE SERVICES AVAILABLE TO GULF WAR VETERANS

Like other veterans, those who served in the Gulf War are eligible to receive health care services from VA upon a determination that their condition is service-connected. But, Gulf War veterans with undiagnosed illnesses had difficulty establishing their eligibility to compensation payments prior to enactment of the statutory provision, described above, that provides a means for presumptive service connection. In light of this, VA sought to ensure that Gulf War veterans and active military personnel with complaints of illnesses associated with Gulf War service also have ready access to the VA health care system.

Even before the ground war started in February of 1991, VA began planning for the possibility that American military personnel might be deployed to Southwest Asia. In November of 1990, VA took steps to establish a system to track veterans who might become ill due to their military service.[110] In 1992, VHA finally established the Persian Gulf Registry. The registry's purpose was to serve as a mechanism to assist VA in identifying possible diseases which may have resulted from military service in certain areas of Southwest Asia.

Because so many service members deployed to the Gulf War were National Guard and Reserve personnel, in 1993 Congress approved statutory authority for VA to expand its ability to provide health care coverage to include National Guard and Reserve personnel who served in the Gulf War. Under current law, they are otherwise ineligible to receive that health care. [111] This statutory authority dramatically changed the requirements for delivery of health care services to all Gulf War veterans. For example, Gulf War veterans, unlike other veterans, are not required to file or wait for decisions on their claims for compensation before being eligible to receive health care from VA. As discussed below, Gulf War veterans have the opportunity, unique within the VA structure, to receive free extensive and specialized physical examinations simply by virtue of service in the Gulf War and can also receive medical treatment for conditions VA physicians believe may be related to Gulf War service. This policy is commendable but, as described later in this report, it has not always resulted in delivery of health care to these veterans.

## SPECIAL HEALTH CARE ELIGIBILITY FOR GULF WAR VETERANS

A key part of the legislation passed in 1993 was that Congress also authorized VA to provide health care services to Gulf War veterans who, while serving on active duty in the Southwest Asia theater of operations during the Gulf War, may have been or were exposed to a toxic substance or environmental hazard. [112] The health care services VA is authorized to provide to Gulf War veterans in VA facilities include hospital, nursing home care, and outpatient care. This is true regardless of a determination that a condition is service-connected, the veteran's age, or the veteran's ability to pay for that care. This extension of full health care to Gulf War veterans is a key feature of the 1993 legislation because payment by veterans for VA health care services is usually required except in limited situations such as medical care provided for a service-connected disability. [113] Also, Gulf War

veterans are to be furnished medical care on an outpatient basis in a hospital or clinic ahead of most other nonservice-connected veterans. This priority in delivery of medical care to Gulf War veterans is similar to the priority service provided by law to former prisoners of war who receive medical care at VA facilities for nonservice-connected conditions.[114]

Although Congress created a means for Gulf War veterans to obtain certain health care services from VA that are not available to most other veterans, it also made clear in the 1993 legislation that the presumptions and priorities it created for Gulf War veterans applied solely to the provision of health care services and did not extend to other VA functions, such as compensation claims.[115] Thus, the fact that a Gulf War veteran is eligible for health care services from VA under this statute does not constitute a basis for determining service connection for purposes of an award of compensation payments.

## VBA'S DECISIONS REGARDING COMPENSATION CLAIMS PROCESSING OF GULF WAR CLAIMS HAVE BEEN INCONSISTENT AND COUNTERPRODUCTIVE

As public concern began growing over the possible health consequences to veterans from their Gulf War service, VBA management made several decisions to address their problems. However, as will be explained, these decisions were erratic, did not ultimately respond to the needs of Gulf War veterans, and resulted in lost opportunities to serve these veterans.

One very significant decision made in an effort to respond to Gulf War veterans was to consolidate adjudication of all Gulf War compensation claims based on environmental hazards in the Louisville, Kentucky regional office beginning in December 1992. VA has stated that consolidation of claims processing was done in order to allow decision makers in the Louisville office to develop an expertise in working with the unique issues that these claims raise, dedicate resources to what was believed would be more expeditious processing of the claims, and allow close monitoring of the claims to identify patterns and common health problems that may appear among Gulf War veterans.[116]

At the time VA designated the Louisville regional office as the focal point for adjudicating these unique claims, VA did not anticipate receiving many environmental hazard claims. Early information from DOD suggested that U.S. troops were not exposed to biological or chemical warfare agents and that DOD did not believe such agents were present in the theater of operations.[117] However, the number of claims that were submitted by Gulf War veterans to the Louisville regional office quickly grew to the point that the office could not in fact process them in a timely fashion. For example, by October 1994, the Louisville office was averaging 357 days to process an original (first-time) claim for compensation from Gulf War veterans. At the same time, the national average for

For years, decisions affecting Gulf War veterans have been made by Congress and VA based in part on data collected, analyzed, and provided by VA. For example, beginning in April of 1995 and until August 1997, VBA provided this Committee and interested groups such as veterans service organizations a monthly report. This report contained statistics on the number and status of disability claims filed by Gulf War veterans who are sick due to undiagnosed illnesses and other illnesses resulting from exposure to environmental hazards during their service in the Gulf.[133] The report was based on data drawn from several sources within VA, particularly from VBA's disability benefits payment system database and the Gulf War Tracker. The information in these reports was widely assumed to be reliable and many policy decisions affecting Gulf War veterans were made based on them. Unfortunately, as the SIU discovered and as is discussed below, the data in these reports was flawed in many ways. The result of the inaccuracies has been that efforts to assist Gulf War veterans and make informed decisions regarding delivery of health care services and benefits to those veterans may have been adversely affected, or at least less than what might have been done.

One decision that was based in part on flawed data generated by VA was the determination by VBA, described above, to readjudicate the approximately 4,400 claims by Gulf War that had been denied based solely on the original two year presumptive period. At that time, VA felt that the readjudication of these claims was necessary because the extension to the presumptive rule would result in more veterans receiving compensation payments. However, only a few hundred grants of service connection for undiagnosed illnesses have resulted from the readjudication of these claims.[134] This suggests that data was poorly collected and managed so that many of the claims that had been recorded as denied because the veteran's undiagnosed illness fell outside the original two-year presumptive rule were in fact denied on other grounds.

In response to questions about the validity of its data from SIU investigators, VA acknowledged that it had not adequately collected and analyzed data sufficient for shaping informed decisions on Gulf War veterans. VA reached this conclusion by reviewing the sources of the information and comparing that data to what should have been identical data. For example, VA compared its data concerning the number of Gulf War veterans who were discharged from the military against DOD-generated data on discharged military personnel. The result of this comparison led VA to conclude that many more Gulf War veterans were receiving compensation payments from VA than was previously believed. For example, VA had generated and distributed reports, and had testified before Congress based on those reports, that in April 1997, 28,580 veterans were receiving compensation payments for service-connected conditions based on their service during the Gulf War. However, once it compared its claims data to DOD's data at the suggestion of SIU investigators, VA discovered that 69,613 Gulf War veterans—over twice what VA had believed to be the case—were in fact receiving compensation payments.[135]

VA reacted swiftly when it discovered that the statistics on Gulf War veteran claims that it had made public and on which it and others had relied were inaccurate. VA's Acting Secretary at that time stated in a letter to the Chairman and Ranking Member of this Committee that he "[could] not

claim confidence in the data previously provided [to the Committee]. This is an embarrassment to the Department of Veterans Affairs."[136] The Acting Secretary immediately designated a senior executive under the leadership of VA's Assistant Secretary for Policy and Planning to serve as the Project Manager for management of Gulf War information. At the same time, the Acting Secretary appointed the Assistant Secretary for Policy and Planning as the Department's liaison to Congress on all Gulf War issues and to "coordinat[e] all departmental information pertaining to the Persian Gulf conflict." [137]

VA must continue to improve its internal information systems so that accurate and reliable data on Gulf War veterans' claims can be produced, although it has not and will not be an easy task for VA at this point to do so. In addressing this problem, to date VA has succeeded in producing only basic data on Gulf War veterans on a quarterly basis but it is hoped that policy decision makers soon will be able to rely on complete, validated information when analyzing actions needed on behalf on Gulf War veterans. To accomplish this, VA must eliminate the internal problems that have hindered it in responding to Gulf War veterans' concerns in a timely and effective way. For example, to date VBA and VHA have been reluctant to provide VA's project manager for Gulf War veterans' data with full access to the information they administer despite the priority to do so established by the Secretary-Designate in September 1997.

Despite the Acting Secretary's commitment that the VA would correct its faulty data and would not use such statistics again until the information was proved valid, VA has continued to publicly release and use statistics about Gulf War veterans health care and benefits that are unverified. For example, in testimony before the House Committee on Veterans Affairs on February 5, 1998, VA's Under Secretary for Benefits cited statistics drawn from VBA's databases which remained of questionable validity. During that testimony the Under Secretary cited two different figures—2,306 and 1,590—as the number of VBA decisions granting service connection for undiagnosed illness.[138] The discrepancy in numbers was explained by the Under Secretary as due to the fact they were generated by unrelated data systems in VBA. Regardless of the reason for the discrepancy, neither figure matches the number validated by VA's project manager for Gulf War veterans' data (and the number that will be used for purposes of this report) of 1,492 undiagnosed illness compensation grants. This figure was publicly released by the Assistant Secretary for Policy and Planning less than a week before that hearing and presumably was available for use in VA's testimony at that time. Moreover, it is unlikely that this number could have increased by either 100 or 800 claims in a matter of days.[139]

At the same hearing, VA's Under Secretary for Health stated that between 10 and 25 percent of the approximately 66,000 Gulf War veterans who have participated in the Persian Gulf Registry Program—that is, between 6,600 and 16,000 veterans—have been found by VA doctors to have unexplained illnesses.[140] These numbers are far greater than the VBA's estimated numbers of from approximately 1,600 to 2,300 Gulf War veterans who are service-connected for undiagnosed illnesses and raise the question why so few Gulf War veterans who have undiagnosed illnesses are receiving

VA compensation. In any event, any public use by VA officials of data that is known or should be known to be questionable seriously weakens VA's credibility as to its entire Gulf War program. VA's continuing failure to generate accurate data on the number of Gulf War veterans with undiagnosed illnesses suggests that VA at present cannot accurately determine who it serves and how it serves them. As discussed later in this chapter, this failure to resolve clear conflicts and contradictions in the information maintained in VBA and VHA has serious implications for service to Gulf War veterans.

## INEFFECTIVE MONITORING OF HEALTH CARE AND BENEFITS ADMINISTRATION RESULTS IN INCONSISTENT DELIVERY OF VA BENEFITS TO GULF WAR VETERANS

It is one of VA's highest priorities to deliver health care treatment to all Gulf War veterans with service-connected disabilities. Yet VA, when asked in October of 1997 about the 1,360 veterans who its statistics indicated were at that time service-connected for undiagnosed illness, could not say whether those veterans were also receiving treatment for those illnesses. VA has collected data to determine if an individual Gulf War veteran has received inpatient or outpatient medical services at a VA facility, but the data does not indicate for what condition. In the case of a veteran with a service-connected undiagnosed illness who seeks inpatient or outpatient treatment for that service-connected illness, VA has been unable to consistently track whether the undiagnosed condition has improved or worsened.

Moreover, many more Gulf War veterans may be entitled to compensation for Gulf War veterans with undiagnosed illnesses than currently are receiving such benefits. There does not seem to be any coordinated effort at VA to date to determine why 6,600 to 16,000 veterans on the Persian Gulf Registry have been determined to have an unexplained illness yet far fewer veterans are receiving compensation for service-connected undiagnosed illnesses. When SIU investigators discussed this issue with VA officials, they could not explain why this situation exists nor did they know which Persian Gulf Registry participants with undiagnosed illnesses have filed claims for compensation.

VA has made no effort to monitor in an organized way the health outcomes of Gulf War veterans with undiagnosed illnesses on either the health registry or service-connected compensation rolls. VA has stated, however, that as of February 1998, 140,000 of the nearly 700,000 veterans who served in the Gulf War conflict[141] have had their claims adjudicated to establish a service-connected disability and 243,000 Gulf War veterans have used VA medical facilities in some way since their return from the war.[142] Both VA and DOD express concerns that valid scientific conclusions could not be made by tracking this inherently self-selected population of veterans choosing to file claims or use VA health care facilities. Nevertheless, the VA is missing opportunities to discover what, if any, similarities exist in the health status of the almost 40 percent of the total Gulf War veteran

population that has sought medical services at VA medical facilities by monitoring their health outcomes.

Analogous to VHA's ineffective monitoring of Gulf War veterans' health status is VBA's inability to effectively resolve claims filed by Gulf War veterans. SIU investigators interviewed many regional office employees across the country who almost universally noted the difficult and time-consuming nature of Gulf War veterans claims involving undiagnosed illnesses as compared to other claims. However, while these claims generally require the application of different rules and more attention to detail than do other claims, they do not generally involve the level of complexity or require the amount of resources that regional office personnel attribute to them. An exception to this is the question of how to handle claims involving undiagnosed illness when that issue is not specifically raised by the veteran but is inferred from evidence in the claims record.

Precisely because of its undiagnosed nature, questions about the causes of illnesses suffered by Gulf War veterans often are difficult to determine. During site visits to regional offices, SIU investigators reviewed a limited number of already-processed Gulf War veteran claims in which a finding of an undiagnosed illness was not part of the decision. However, in some of these claims SIU investigators identified symptoms in the veteran's claims record that were unrelated to a diagnosis and thus should have been considered inferred claims for "undiagnosed illnesses." It is likely that this circumstance is true for some number of claims other than those reviewed by SIU investigators, suggesting that at least some of the aggregate number of Gulf War veterans' claims may need to be revisited in the future either when veterans or their service organization representatives request reconsideration of the claims or if appealed to the Board of Veterans Appeals.

As described earlier in this chapter, VA believed it could best serve Gulf War veterans who filed disability compensation claims for undiagnosed illnesses by centralizing claims processing at four area processing offices because in doing so the expertise of the compensation decision makers at those offices would increase. Intense training efforts were conducted for these decision makers at the time VA designated these four area processing offices. However, VBA management's quality reviews repeatedly indicated that VBA decision makers at the area processing offices had not been able to produce adequate quality decisions. For example, in some claims there was a failure to consider all issues reflected by evidence in the record and decisions were made knowing that the record was incomplete.[143] In addition to producing incorrect decisions on many of these claims, internal VA reviews conducted between November 1995 and April 1997 also showed that because the four area processing offices that had been assigned the task of reviewing all Gulf War veterans' compensation claims were overwhelmed by the volume of claims related to exposure to environmental hazards, large backlogs of those claims developed.[144] This meant that Gulf War veterans were not receiving timely decisions on their claims.

When this large backlog triggered the May 1997 redistribution of Gulf War claims back to regional offices,[145] training for regional office personnel was provided. However, the SIU learned that

many employees in the regional offices who are now either making decisions on Gulf War veteran claims or are reviewing them for accuracy never received this training. As a consequence, Gulf War veterans, at least where the issue of quality of decision making on Gulf War veteran claims is concerned, may not be benefitting from VA's decision to redistribute Gulf War claims. Moreover, during site visits to numerous regional offices around the country, SIU investigators reviewed already-processed Gulf War veteran claims that had previously been validated as correct as part of the regional offices' quality assessment efforts since these claims were returned to them for processing. The SIU's investigators found inconsistent quality and numerous errors although these claims had already been validated as correct by the regional offices. Unfortunately, it does not appear that Gulf War veterans' claims are unique in this regard. VBA has recently identified an overall error rate of 36 percent in claims processed by VBA.[146] Because VBA employees stated to SIU investigators that they find Gulf War claims difficult because they are complex and involve many issues, the SIU believes that the error rate in Gulf War claims decisions is likely to be higher than 36 percent.

In view of these quality problems and the fact that each claim may also contain unaddressed issues that can be but may not have been inferred from the claims record, VBA's readjudication effort may create more problems than it solves if the ultimate result is large numbers of appeals to the Board of Veterans' Appeals (BVA). Additionally, when incorrectly processed claims are reviewed by the BVA, they may be remanded for correction to the regional offices where they originated. Appeals are easily the most expensive and labor-intensive component of VA's claims process.[147] However, the costs may be felt more by Gulf War veterans who must endure longer waits before receiving decisions on their claims. This may be especially true since early indications suggest that there may be a high remand rate on Gulf War veterans' claims[148] if they move into the appellate stage without adequate claims resolution. However, the SIU was unable to discern much interest in or efforts by or between the VBA and the BVA to plan for the possibility that many of the pending Gulf War claims may require remands. Much will depend on the Gulf War veterans' awareness about VA's claims process and motivation to pursue their claims at the appeal level in order to receive adequate resolution of their claims.

## VA Does Not Comply with its Own Regulations and Policy Directives

A primary role of the VA's Central Office is to develop regulations and policies that provide guidance as to what and how benefits and services are to be delivered to veterans. Policy makers and program administrators at the highest level in VA need to know if regional offices and medical facilities are actually implementing these instructions. The VA at the national level articulates well what must be done and what it is doing for Gulf War veterans with undiagnosed illnesses. Yet there is little evidence that these articulated policies are actually being implemented at the points where benefits and services are delivered to veterans: in regional offices and medical facilities.

Regional office personnel rely on thorough medical evaluations by VHA physicians in order to make decisions on veteran's compensation eligibility. Yet, all too often regional office personnel that

were interviewed by SIU investigators complained about the inadequacy of many medical evaluations and feel they have little influence over the inconsistent results of examinations. SIU investigators learned that examining physicians were able to conclude during a Persian Gulf Registry examination that a veteran had an undiagnosed illness. However, the same conclusion was not reached during an examination for compensation benefits, even though often both examinations are conducted by the same physician. Further, SIU investigators also found veterans' health records that listed "Gulf War Syndrome" or "Multiple Chemical Sensitivity" as a diagnosis upon completion of an examination for compensation benefits. However, VA does not recognize "Gulf War Syndrome" or "Multiple Chemical Sensitivity" as a treatment diagnosis for VA health care purposes or for compensation payment purposes. That this situation exists suggests that VA is not complying with its own definition of undiagnosed illnesses. It also suggests that VA is setting separate standards for the Persian Gulf Registry examination and the compensation examination to reach a determination that the veteran has an undiagnosed illness.

Another area in which the SIU identified significant failures on the part of the VA to follow its own regulations and directives is in the development and adjudication of inferred issues. As was mentioned earlier in this chapter, an inferred issue is a "sign or symptom" that is unrelated to a diagnosis which appears in the record but is not specifically articulated by a veteran as a claim for compensation.[149] In such situations, VA personnel reviewing a claim are required to consider the "sign or symptom" as if the veteran had specifically filed a compensation claim for that condition.[150] However, when SIU investigators examined Gulf War veterans' claims files at various regional offices, VA personnel in 16 out of 22 offices visited had failed to develop and adjudicate inferred issues. One regional office told SIU investigators that it is that office's policy that a veteran must specifically indicate that a claim is due to an undiagnosed illness or it will not be developed as such; this office consequently had never developed or adjudicated inferred issues in any Gulf War claims.

In addition to these problem areas, the SIU found numerous other failures on the part of the VA to follow its own regulations and directives. One of these involves the legal standards upon which claims for undiagnosed illness were denied. In some regional offices, VA personnel determined that veterans' claims for undiagnosed illnesses were not well grounded, meaning that they were not plausible or capable of being supported by proof or evidence.[151] However, at a national training conference, VBA management personnel instructed that due to the unique nature of an undiagnosed illness and the difficulty in medically linking the illness to military service, Gulf War claims should be found well grounded in almost all cases.[152] In addition, some undiagnosed illness claims that originally had been denied were again denied on re-review after the presumptive period's extension on the grounds that no new and material evidence had been submitted to support the claims. This is contrary to legal precedent holding that it is improper to employ a new and material evidence standard for issues in a veteran's claim that are being readjudicated under a liberalizing law (which in this case is the extended presumptive period during which a Gulf War veteran can qualify for compensation payments based on an undiagnosed illness).[153] Moreover, SIU investigators found upon review of Gulf War veterans' claims completed in the regional offices that compensation

decision makers failed to consider the veterans' symptoms under the undiagnosed illness regulation, even though the symptoms met the criteria for that consideration.[154] Additionally, VA personnel at some regional offices failed to conform to guidelines by prematurely adjudicating undiagnosed illness claims although the claims file had not been reviewed by the examining physician prior to completion of an examination nor had required specialist referral examinations occurred.[155] Based on this evidence, it appears that the VA's failure to comply with its own regulations and policies may be adversely affecting Gulf War veterans' abilities to qualify for the benefits Congress intended them to receive.

GAO's preliminary observations on medical care provided to Gulf War veterans are parallel to the SIU investigators' findings that VHA directives developed to make it possible for medical personnel to respond to the health care needs of Gulf War veterans are not being followed.[156] For example, VHA's Persian Gulf Registry directives list clinical procedures and polices to be followed in conducting physical examinations of Gulf War veterans and for ordering diagnostic studies to determine the scope of Gulf War veterans' illnesses. When the health registry examination process is completed and the veteran still has an illness that is undiagnosed, VHA directives state that the veteran should be referred for further evaluation to one of VA's four Gulf War Referral Centers located in Birmingham, Houston, Washington, D.C., and West Los Angeles.[157] Although VA directives are very specific as to what is required, the SIU learned that medical facilities across the country are confused over the directives to follow in assessing Gulf War veterans' health, when to do additional evaluations, and when to refer a veteran to a Gulf War Referral Center.

VHA directives establish that the health registry examination process be divided into two phases. Phase I is intended to serve as an opportunity to obtain a medical and occupational history from the veteran followed by a physical examination with additional diagnostic studies and tests conducted if needed. If at the end of the Phase I examination a Gulf War veteran still has an illness that is undiagnosed, a Phase II examination under VHA directives is required to perform supplemental laboratory tests and consultations.[158] Several Gulf War physicians told SIU investigators that they were confused over when to refer a Gulf War veteran to the second phase of the examination process. Other Gulf War physicians informed SIU investigators that they do not feel that the Phase II examination is necessary. Consequently, if some physicians do not understand the extent to which they are authorized to go in order to assess the health status of Gulf War veterans with undiagnosed illnesses, then some Gulf War veterans may not be receiving the level of medical attention required to overcome their health problems.

In testimony before the House Committee on Veterans' Affairs Subcommittee on Health, GAO reiterated that Gulf War veterans who do not receive a diagnosis after Phase II are to be referred for further evaluation at one of VA's four Gulf War Referral Centers. However, of the approximately 6,600 to 16,000 Gulf War veterans that VA reported as having undiagnosed illnesses, only about 500 have been evaluated at a referral center. Additionally, after a review of medical records and discussions with program officials, including physicians, GAO concluded that it did not appear that

VA's directives were being consistently applied by the medical facilities. For example, the GAO noted that physicians did not provide all of the tests to veterans that were called for in VA's guidance. Also, in several cases, the physician's diagnosis was simply a restatement of the veteran's symptoms.[159] These examples suggest that VHA's guidance to Gulf War physicians simply is not clear enough to result in proper compliance. When VHA physicians do not follow the medical protocols established to help them and Gulf War veterans understand the scope of the veterans' health status, then veterans are placed at greater risks of never receiving appropriate medical attention to overcome their illnesses.

## INADEQUATE INTERNAL INFORMATION SHARING AT VA CREATES BARRIERS THAT HINDER EFFORTS TO DELIVER BENEFITS AND SERVICES

Communication problems between VA's Central Office and personnel in local facilities are pervasive across the country. These problems have yet to be adequately acknowledged or addressed at VA. The SIU's investigation indicates that VBA management program offices often do not communicate effectively with each other. VA Central Office program managers often do not communicate well with field level program managers; VA field level managers often do not talk to field managers in other regional offices. As discussed below, these failures to share important information and to collaborate based on that information contributes to an atomized approach to providing services which in turn fosters the frustration that Gulf War veterans often express in dealing with VA.

VA encourages Gulf War veterans to seek health care services and compensation benefits if they believe their health was adversely affected while serving in the military. For example, VA has held numerous public forums targeted at providing information to Gulf War veterans about VA services and programs available to them. However, Gulf War veterans seeking health care and compensation payments from VA are faced with two separate and distinct VA systems: the Veterans Health Administration, designed to provide health care, and the Veterans Benefits Administration, designed to provide compensation and pension benefits. The SIU's investigators determined that these two systems have not worked well together and that this lack of cooperation has an adverse impact on Gulf War veterans' ability to obtain both high quality health care and timely and accurate compensation decisions from VA.

A determination of service connection for a veteran's health problems often means more to that veteran than the ability to receive compensation payments. Such a determination means the difference between getting health care at VA medical facilities and not getting it, because veterans receive health care services from VA for conditions that are determined to be service-connected. The SIU, however, was not convinced that the VA fully understands this reality, since VA health care providers and claims processors do not share a common understanding of the process of determining whether a health condition is service-connected.

UT Southwestern
Medical Center®

Ex. B

MedBlog

# Unlocking the causes of Gulf War Illness

January 12, 2023

*Brain;*
*Discovery*



**Bob Haley, M.D.**
Internal Medicine - Infectious Diseases and Geographic Medicine

03:05

Veteran John Mumby walked 850 miles across Texas in 2022 to raise awareness for the research being done for Gulf War Illness.

The cause of Gulf War Illness (GWI) was a mystery that eluded clinicians and researchers for 30 years – but now, we finally have the answer. In May 2022, UT Southwestern researchers demonstrated that GWI is real, that exposure to the chemical agent sarin is to blame, and that a genetic variant explains why 175,000 Gulf War veterans became chronically ill.

Early in the initial air campaign of the 1991 Gulf War, U.S. and Coalition planes bombed massive Iraqi chemical weapons storage sites, releasing fallout that exposed U.S. troops to low-level sarin nerve agent. Sarin is fatal in high levels of exposure and causes long-term neurological impairment at low exposure levels.

Chemicals from the resulting cloud of debris exposed troops kilometers away, causing a quarter of servicemembers to experience a constellation of debilitating symptoms:

Ex. B

of Texas Southwestern Medical School looked at the genes and surveys of those affected.

"Quite simply, our findings prove that Gulf War illness was caused by sarin, which was released when we bombed Iraqi chemical weapons storage and production facilities," said Dr. Robert Haley, the study's lead author and director of epidemiology in the internal medicine department at UT Southwestern.

"There are still more than 100,000 Gulf War veterans who are not getting help for this illness, and our hope is that these findings will accelerate the search for better treatment."

The researchers included 1,016 veterans of the Persian Gulf War—about half of whom have Gulf War illness. They also tested for a pair of gene variants, one of which efficiently breaks down sarin and one that processes some pesticides but not sarin. Different combinations of these gene types can have varying impacts on developing Gulf War illness.

The study found that those with the least protective genotype, and who heard chemical alarms during the war, were nearly nine times more likely to develop symptoms.

Sarin was not only stored in Saddam Hussein's Iraq but also used on the country's citizens. In 1988, as the Iran–Iraq War was drawing to a close, Iraqi Kurds in Halabja, an Iraqi town about 9 miles from Iran, were targeted with a mixture of chemical weapons, one of which was sarin.

Armed with the knowledge of past use, American and coalition forces sought to eliminate the likelihood of sarin being deployed against them. However, little did they know it would result in American troops being unknowingly exposed to toxic substances once again.

"As is common with toxic exposures, we may not have immediate answers as to why groups of veterans develop

# UTSW genetic study confirms sarin nerve gas as cause of Gulf War illness

May 11, 2022

## Troops who had genes that help metabolize sarin were less likely to develop symptoms



DALLAS – May 11, 2022 – For three decades, scientists have debated the underlying cause of Gulf War illness (GWI), a collection of unexplained and chronic symptoms affecting veterans of the Persian Gulf War. Now researchers led by Robert Haley, M.D. (HTTPS://PROFILES.UTSOUTHWESTERN.EDU/PROFILE/12888/ROBERT-HALEY.HTML), Professor of Internal Medicine and Director of the Division of Epidemiology at UT Southwestern, have solved the mystery, showing through a detailed genetic study that the nerve gas sarin was largely responsible for the syndrome. The findings were published (https://ehp.niehs.nih.gov/doi/10.1289/EHP9009) in *Environmental Health Perspectives*, a peer-reviewed journal supported by the National Institute of Environmental Health Sciences, with an accompanying editorial on the paper (https://ehp.niehs.nih.gov/doi/10.1289/EHP11057) by leading environmental epidemiologists.

Dr. Haley's research group not only discovered that veterans with exposure to sarin were more likely to develop GWI, but also found that the risk was modulated by a gene that normally allows some people's bodies to better break down the nerve gas. Gulf War veterans with a weak variant of the gene who were exposed to sarin were more likely to develop symptoms of GWI than other exposed veterans who had the strong form of the gene.



Robert Haley, M.D.

"Quite simply, our findings prove that Gulf War illness was caused by sarin, which was released when we bombed Iraqi chemical weapons storage and production facilities," said Dr. Haley, a medical epidemiologist who has been investigating GWI for 28 years. "There are still more than 100,000 Gulf War veterans who are not getting help for this illness and our hope is that these findings will accelerate the search for better treatment."

In the years immediately following the Gulf War, more than a quarter of the U.S. and coalition veterans who served in the war began reporting a range of chronic symptoms, including fatigue, fever, night sweats, memory and concentration problems, difficulty finding words, diarrhea, sexual dysfunction, and chronic body pain. Since then,

both academic researchers and those within the military and Department of Veterans Affairs have studied a list of possible causes of GWI, ranging from stress, vaccinations, and burning oil wells to exposure to pesticides, nerve gas, anti-nerve gas medication, and depleted uranium.

Over the years, these studies have identified statistical associations with several of these, but no cause has been widely accepted. Most recently, Dr. Haley and a colleague reported a large study (https://www.nature.com/articles/s41598-021-82535-3) testing veterans' urine for depleted uranium that would still be present if it had caused GWI and found none.

"As far back as 1995, when we first defined Gulf War illness, the evidence was pointing toward nerve agent exposure, but it has taken many years to build an irrefutable case," said Dr. Haley, who holds the U.S. Armed Forces Veterans Distinguished Chair for Medical Research, Honoring Robert Haley, M.D., and America's Gulf War Veterans.

Sarin is a toxic man-made nerve agent, first developed as a pesticide, that has been used in chemical warfare; its production was banned in 1997. When people are exposed to either the liquid or gas form, sarin enters the body through the skin or breathing and attacks the nervous system. High-level sarin often results in death, but studies on survivors have revealed that lower-level sarin exposure can lead to long-term impairment of brain function. The U.S. military has confirmed that chemical agents, including sarin, were detected in Iraq during the Gulf War. In particular, satellite imagery documented a large debris cloud rising from an Iraqi chemical weapons storage site bombed by U.S. and coalition aircraft and transiting over U.S. ground troop positions where it set off thousands of nerve gas alarms and was confirmed to contain sarin.

Previous studies have found an association between Gulf War veterans who self-reported exposure to sarin and GWI symptoms. However, critics have raised questions of recall bias, including whether veterans with GWI are simply more likely to remember and report exposure due to their assumption that it may be linked to their illness. "What makes this new study a game-changer is that it links GWI with a very strong gene-environment interaction that cannot be explained away by errors in recalling the environmental exposure or other biases in the data," Dr. Haley said.



Dr. Robert Haley (left) visits with two longtime GWI research supporters, former Sen. Kay Bailey Hutchison and the late Ross Perot, at a campus event in 2006.

In the new paper, Dr. Haley and his colleagues studied 508 deployed veterans with GWI and 508 deployed veterans who did not develop any GWI symptoms, all randomly selected from more than 8,000 representative Gulf War-era veterans who completed the U.S. Military Health Survey. They not only gauged sarin exposure – by asking whether the veterans had heard chemical nerve gas alarms sound during their deployment – but also collected blood and DNA samples from each veteran.

The researchers tested the samples for variants of a gene called *PON1*. There are two versions of *PON1:* the Q variant generates a blood enzyme that efficiently breaks down sarin while the R variant helps the body break down other chemicals but is not efficient at destroying sarin. Everyone carries two copies of *PON1*, giving them either a QQ, RR or QR genotype.

For Gulf War veterans with the QQ genotype, hearing nerve agent alarms – a proxy for chemical exposure – raised their chance of developing GWI by 3.75 times. For those with the QR genotype, the alarms raised their chance of GWI by 4.43 times. And for those with two copies of the R gene, inefficient at breaking down sarin, the chance of GWI increased by 8.91 times. Those soldiers with both the RR genotype and low-level sarin exposure were over seven times more likely to get GWI due to the interaction per se, over and above the increase in risk from both risk factors acting alone. For genetic epidemiologists, this number leads to a high degree of confidence that sarin is a causative agent of GWI.

"Your risk is going up step by step depending on your genotype, because those genes are mediating how well your body inactivates sarin," said Dr. Haley. "It doesn't mean you can't get Gulf War illness if you have the QQ genotype, because even the highest-level genetic protection can be overwhelmed by higher intensity exposure."

This kind of strong gene-environment interaction is considered a gold standard for showing that an illness like GWI was caused by a particular environmental toxic exposure, he added. The research doesn't rule out that other chemical exposures could be responsible for a small number of cases of Gulf War illness. However, Dr. Haley and his team carried out additional genetic analyses on the new data, testing other factors that could be related, and found no other contributing causes.



Dr. Robert Haley, here reviewing brain scans of Gulf War veterans, has been studying the illness for 28 years.

"There's no other risk factor coming anywhere close to having this level of causal evidence for Gulf War illness," said Dr. Haley.

The team is continuing research on how GWI impacts the body, particularly the immune system, whether any of its effects are reversible, and whether there are biomarkers to detect prior sarin exposure or GWI.

Other UTSW researchers who contributed to this study include John Teiber, Gerald Kramer, and Junhui Xiao. The U.S. Military Health Survey was a collaborative effort of UTSW and a large survey research team at RTI International including Jill Dever, who also contributed to this paper. The study was funded by the U.S. Departments of Defense and Veterans Affairs. Opinions, interpretations, conclusions, and recommendations are those of the authors and are not necessarily endorsed by the U.S. Departments of Defense or Veterans Affairs.

**About UT Southwestern Medical Center**

UT Southwestern, one of the nation's premier academic medical centers, integrates pioneering biomedical research with exceptional clinical care and education. The institution's faculty has received six Nobel Prizes, and includes 26 members of the National Academy of Sciences, 17 members of the National Academy of Medicine, and 14 Howard Hughes Medical Institute Investigators. The full-time faculty of more than 2,900 is responsible for groundbreaking medical advances and is committed to translating science-driven research quickly to new clinical treatments.
UT Southwestern physicians provide care in more than 80 specialties to more than 100,000 hospitalized patients, more than 360,000 emergency room cases, and oversee nearly 4 million outpatient visits a year.

# GULF WAR ILLNESS SYMPTOMS BAFFLED SCIENTISTS. UNTIL NOW.

**POSTED ON SEP 29, 2022 BY MATT SAINTSING**



The origins of Gulf War illness have eluded veterans and medical researchers for decades. But now, a new study seems to have cracked the case on how roughly 250,000 veterans were sickened during the 1991 Persian Gulf War: exposure to the chemical weapon sarin.

While combat lasted 43 days, the harmful health effects on some who served in the conflict have stretched for decades. Known as a cluster of once inexplicable symptoms, Gulf War illness —sometimes called Gulf War syndrome— can include muscle aches, joint pain, dizziness, memory lapses, headaches, fatigue and insomnia.

For more than 30 years, federal efforts have come up short in deciphering the root causes of these puzzling symptoms. To help solve the mystery, a team of researchers at the University

Ex. C

# 91outcomes.com

Gulf War Health & News

## MILITARY TIMES: Top VA official questions use of term 'Gulf War illness'

SOURCE: Military Times, Patricia Kime reporting, Apr. 22, 2014
http://www.militarytimes.com/article/20140422/BENEFITS04/304220036/Top-VA-official-questions-use-term-Gulf-War-illness-

ARCHIVED TEXT:

# Top VA official questions use of term 'Gulf War illness'

**Undersecretary for benefits said name change would be 'limiting'**

Apr. 22, 2014 - 11:53AM | 0 Comments

Tweet

A A

Allison Hickey, VA's benefits chief, has questioned calls by health officials to use the phrase 'Gulf War illness' to describe the various health problems in veterans of the 1990-'91 conflict.

Allison Hickey, VA's benefits chief, has questioned calls by health officials to use the phrase 'Gulf War illness' to describe the various health problems in veterans of the 1990-'91 conflict. (Robert Turtil/Defense Department)

By Patricia Kime
Staff writer

FILED UNDER

Pay & Benefits

Veterans Benefits

After the Institute of Medicine in March recommended using the term "Gulf War illness" to describe symptoms affecting more than 200,000 Persian Gulf War veterans, a top Veterans Affairs Department official expressed concern that such a change would imply a direct causal link between service in the 1990-'91 conflict and long-term illness.

That potentially explosive news was contained in an email sent by an IOM staffer to panel members who made the recommendation,

Ex. C

**Related Links**

Small study finds problem in Gulf War vets' cell function

Scientific panel unable to come up with singular definition for Gulf War illness

House to ask for autonomy for Gulf War Illness board

including chairman Dr. Kenneth Shine. A copy was obtained by Military Times through a third party and later verified as genuine.

In the email, the IOM staffer said Allison Hickey, VA's undersecretary for benefits, questioned the use of "Gulf War illness" rather than the VA-favored "chronic multisymptom illness" in a briefing on the report, "Chronic Multisymptom Illness in Gulf War Veterans."

Hickey "was concerned that changing the name from CMI to GWI might imply a causal link between service in the Gulf and poor health which could necessitate legislation for disability compensation for veterans who served in the Gulf," according to the email.

The statement appears to confirm what many ill Gulf War veterans have long suspected: VA has dodged references to Gulf War illness and research into the condition because officials fear a flood of new disability benefits claims and costly payouts — greatly complicating VA's highly publicized goal to eliminate its backlog of benefits claims by the end of 2015.

Further fueling some veterans' suspicions: Why was Hickey, VA's top benefits official, weighing in on what is, at its core, a health issue?

"If this is true, this is extremely disappointing. Until this is recognized for what it is — Gulf War illness — it's unlikely that any solutions will be found," said Diane Zumatto, AMVETS national legislative director.

But VA insists Hickey's comments had nothing to do with money. Rather, according to VA spokesman Drew Brookie, Hickey's concerns were that the phrase Gulf War illness might be too restrictive, excluding vets from other eras with similar symptoms.

Hickey "asked about limiting the naming of the conditions to one conflict when they could be experienced by any number of veterans from multiple conflicts. ... VA currently recognizes that Gulf War veterans are experiencing these symptoms, yet they are also being experienced, based on the IOM report, by veterans of the current conflicts, as well as veterans deployed elsewhere," Brookie said.

Veterans of Operations Desert Shield and Desert Storm often have butted heads with VA, which they say does not recognize their illness as a physical ailment related to military service and has undermined research that might prove a link between the conflict and disease.

According to VA, three illnesses are presumed to be related to Persian Gulf service: medically unexplained illnesses; some infectious diseases; and amyotrophic lateral sclerosis, or Lou Gehrig's disease.

With the listing of "medically unexplained illnesses" as a presumptive condition, most Gulf War vets with associated symptoms — fatigue, cognition issues, musculoskeletal problems, gastrointestinal issues, breathing problems and neurologic concerns — may already be eligible for compensation.

But getting a claim approved for a medically unexplained illness is tough. As of 2011, the last time VA published statistics on claims for undiagnosed illnesses among Gulf War vets, 20,069 claims had been approved while 16,725 were denied.

VA did not provide updated data by press time.

"It's been a frustration all along. We've had to fight to get care, fight to get a research advisory committee, we've had to go to civilian doctors to try to get answers," said Denise Nichols, a Gulf War veteran and advocate.

The past year has seen continued sparring between the VA and Gulf War veterans. In June, VA made changes to the Research Advisory Committee on Gulf War Veterans Illnesses that led to the removal of all but one of its board members.

VA also has invested in research that looks into stress as a possible cause, which doesn't sit well with physically sick vets.

VA research was called into question in May, when former researcher Stephen Coughlin testified that VA hid or manipulated data and results. The VA inspector general later cleared the department of all but three of the allegations.

House lawmakers in March introduced legislation to restore the advisory committee's independence and promote research.

"It is well past time for officials at the VA to focus on identifying veterans who may be affected, instead of trying to sow doubt about the disease's existence," said Rep. Phil Roe, R-Tenn., a physician who has pushed for congressionally directed research into Gulf War illness.

Dr. James Baraniuk, a prominent researcher on Gulf War-related illnesses, agreed.

"I was not aware that VA was caring for veterans of other campaigns using the terminology CMI," Baraniuk said, referring to Hickey's comments. "What diagnosis code do they use? Is there a CMI diagnosis and treatment statement, guidance, or algorithm within the VA?"

In a written statement, VA spokesman Drew Brookie said the department agrees that "there are health issues associated with service in the Gulf War, and is committed to ensuring Gulf War veterans have access to the care and benefits they have earned and deserve."

Nichols, whose symptoms include joint pain, fatigue, cognitive issues and chemical sensitivity, said that if VA was truly concerned, it would have changed its policy a long time ago.

"It's a shame VA cannot be proactive. It's a shame we have gone through 23, 24 years of this. They have the authority to fix this and they haven't. Most of us feel betrayed," Nichols said.

As a library, NLM provides access to scientific literature. Inclusion in an NLM database does not imply endorsement of, or agreement with, the contents by NLM or the National Institutes of Health. Learn more about our disclaimer.

APHA American Public Health Association Promoting Public Health Research, Policy, Practice and Education About Us Subscriptions Submissions American Journal of PUBLIC HEALTH

Am J Public Health. 2005 August; 95(8): 1382–1388.
doi: 10.2105/AJPH.2004.045799

PMCID: PMC1449370
PMID: 16043669

# Mortality in US Army Gulf War Veterans Exposed to 1991 Khamisiyah Chemical Munitions Destruction

Tim A. Bullman, MA, Clare M. Mahan, PhD, Han K. Kang, DrPH, and William F. Page, PhD

## Abstract

*Objectives.* We investigated whether US Army Gulf War veterans who were potentially exposed to nerve agents during the March 1991 weapons demolitions at Khamisiyah, Iraq, are at increased risk of cause-specific mortality.

*Methods.* The cause-specific mortality of 100487 exposed US Army Gulf War veterans was compared with that of 224980 unexposed US Army Gulf War veterans. Exposure was determined with the Department of Defense 2000 plume model. Relative risk estimates were derived from Cox proportional hazards models.

*Results.* The risks of most disease-related mortality were similar for exposed and unexposed veterans. However, exposed veterans had an increased risk of brain cancer deaths (relative risk [RR]=1.94; 95% confidence interval [CI]=1.12, 3.34). The risk of brain cancer death was larger among those exposed 2 or more days than those exposed 1 day when both were compared separately to all unexposed veterans (RR=3.26; 95% CI=1.33, 7.96; RR=1.72; 95% CI=0.95,3.10, respectively).

*Conclusions.* Exposure to chemical munitions at Khamisiyah may be associated with an increased risk of brain cancer death. Additional research is required to confirm this finding.

Feedback

On March 4 and 10, 1991, combat engineer and explosive ordnance disposal units of the US Army XVIII Corps destroyed 2 large Iraqi weapons caches at Khamisiyah, Iraq. In October 1991, March 1992, May 1992, and May 1998, representatives from the United Nations Special Commission in-

Ex. D

spected Khamisiyah and detected the existence of sarin and cyclosarin in both intact and damaged rockets in the bunker and pit. Military personnel who were possibly exposed to chemical warfare agents at Khamisiyah were identified by environmental and climatological modeling of the plume dispersion.

Sarin is a toxic nerve agent produced for chemical warfare. Sarin can be inhaled or absorbed via the mucous membranes, skin, or eyes, and at sufficient dosage it can cause convulsions and death.1 Acute sarin exposure produces a well-characterized acute cholinergic reaction, and doses sufficient to produce an acute reaction have been associated with persistent health effects such as fatigue, vision problems, and headaches.1 There is no evidence that sarin is carcinogenic.2

Several studies have examined cause-specific mortality risks associated with Gulf War service by comparing the mortality of all Gulf War veterans to that of veterans who served in the military during the period of the Gulf War but did not serve in the Persian Gulf region.3-5 Although reporting that Gulf War veterans were at increased risk for traumatic deaths, the studies did not find any increased risk of disease-related deaths. One of these studies assessed cause-specific mortality among Gulf War veterans who were considered exposed to nerve gas on the basis of the 1997 plume model.4 When the mortality of 48281 Gulf War veterans who were exposed to nerve gas at Khamisiyah was compared with that of 573621 Gulf War veterans who were not exposed, there was no increased risk in either overall or cause-specific mortality among exposed veterans. Another study using the same exposure model found no unusual morbidity among exposed troops.6

To determine whether adverse health are outcomes associated with exposure to chemical agents released at Khamisiyah, we compared the mortality of all exposed US Army Gulf War veterans to that of unexposed US Army Gulf War veterans, using the 2000 plume model to assess potential for exposure.

## METHODS

### Identification of Study Subjects

The cohort for this study was selected in collaboration with the Office of the Special Assistant for Gulf War Illnesses, the Deployment Environmental Surveillance Program of the US Army Center for Health Promotion and Preventive Medicine, and the Environmental Epidemiology Service of the Department of Veterans Affairs.

We used the 2000 plume model to provide exposure status for 351121 army personnel deployed to the Persian Gulf during the Gulf War (August 1990 to March 1991). Of these veterans, 80 were determined to have died in the Gulf and were excluded from this analysis, leaving a total of 351041 (Figure 1⯈). Among these veterans, 100487 were considered exposed and 224980 were considered unexposed. Exposure could not be determined for 25574 veterans, because of missing or invalid unit or service date information.

# Distinct Units Exposed March 10-13, 1991

## Khamisiyah Pit Demolition

PLEASE do not think this is an all inclusive list. It took the DOD several months to add units from the National Guard and Reserve units that were also in the area.
Also, some veterans who were in the area of Khamisiyah when the DOD was first forced to admit to the exposures STILL have not yet received a letter from the DOD telling them they may have been exposed.
If your unit is not listed (as mine is not, yet units near us are listed) send a note to the DOD Gulf War Illness investigative team and let them know.
brostker@gwillness.osd.mil
Maybe someday the list will be complete enough to help other soldiers.
Note: I listed The Units the best I could!
As some MAY NOT be with Their Parent Unit, due to The "jumbled" List that I got!
Thanks to Sandflea for this!!!

---

# Major Units - Division Size and Up

## VII Corps

1st Armored Div. 1st Cavalary Div. 3rd Armored Div.

## XVIII Airborne Corps

24th Mechanized Infantry82nd Airborne Div. 101st Airborne Div.
2nd A.C.R.

### Smaller Units

Artillery AviationChemical Combat SupportEngineers MedicalMilitary Intelligence
Military Police OrdinanceQuartermaster SignalTransportation Other
Infantry and Armor Units

# VII Corps

VII th Corps Tactical Command Post
Tactical Command Post, VII th Corps Field Artillery
Headquarters and Headquarters Troop, 3rd Armored Cavalry Regiment
2nd Corps Support Command (Logistics Group)
1st INF DIV. 3rd Brigade,2 AD (FWD) Task Force 1/41

## 1st Armored Division

Headquarters and Headquarters Company, 1st Armor Division
Headquarters and Headquarters Company, 1st Division Support Command, 1st Armor Div.
Headquarters and Headquarters Company, 4th Brigade, 1st Armor Division
Headquarters and Headquarters Company, 2nd Brigade, 1st Armor Division
Headquarters and Headquarters Company, 3rd Brigade, 1st Armor Division
Headquarters and Headquarters Battery Division Artillery, 1st Armor Division
Headquarters and Headquarters Company, 3rd Brigade, 3rd Infantry Division
2nd Battalion, 67th Armor
2nd Battalion, 1st Aviation
4th Battalion, 8th Cavalry
5th Battalion, 18th Infantry
3rd Battalion, 5th Infantry

Headquarters and Headquarters Company, Division Support Command, 101st Airborne Division
Headquarters and Headquarters Company, 101st Aviation Brigade

Unit

# Artillery Units

6th Battalion, 3rd Air Defense
5th Battalion, 3rd Air Defense Artillery
A Battery, 5th Battalion, 3rd Air Defense Artillery Regiment
Headquarters and Headquarters Battery, 5th Battalion, 3rd Air Defense Artillery
3rd Battalion, 4th Air Defense Artillery Regiment
A Battery, 3rd Battalion, 4th Air Defense Artillery Regiment
B Battery, 3d Battalion, 4th Air Defense Artillery Regiment
C Battery, 3rd Battalion, 4th Air Defense Artillery Regiment
Headquarters and Headquarters Battery, 3d Battalion, 4th Air Defense Artillery
1st Platoon, D Battery, 4th Battalion, 5th Air Defense
B Battery, 1st Battalion, 5th Air Defense
Headquarters and Headquarters Battery, 1st Battalion, 5th Air Defense Regiment
Headquarters and Headquarters Battery, 11th Air Defense Brigade
1st Battalion,17th Field Artillery Regiment
3rd Battalion, 20th Field Artillery
A Battery, 6th Battalion, 27th Field Artillery
B Battery, 25th Field Artillery
C Team, Target Acquisition Battery, 26th Field Artillery
2nd Battalion, 29th Field Artillery
A Battery, 40th Field Artillery
3rd Battalion, 41st Field Artillery
Headquarters and Headquarters Battery, 42nd Field Artillery Brigade
Headquarters and Headquarters Battery, 75th Field Artillery Brigade
1st Battalion, 158th Field Artillery
Headquarters and Headquarters Battery, 196th Field Artillery Brigade
1st Battalion, 201st Field Artillery Regiment
A Battery, 1st Battalion, 201st Field Artillery Regiment
B Battery, 1st Battalion, 201st Field Artillery Regiment
C Battery, 1st Battalion, 201st Field Artillery Regiment
Service Battery, 1st Battalion, 201st Field Artillery Regiment
Headquarters and Headquarters Battery, 1st Battalion, 201st Field Artillery Regiment
A Battery, 1st Battalion, 319th Field Artillery
F Battery, 333rd Field Artillery

# Aviation

3rd Battalion, 1st Aviation
9th Battalion, 1st Aviation
1st Battalion, 3rd Aviation
Headquarters and Headquarters Company, 11th Aviation Brigade
Headquarters and Headquarters Company, 12th Aviation Brigade
B Company, 6th Battalion, 158th Aviation
B Company, 2nd Battalion, 158th Aviation
7th Battalion, 158th Aviation Regiment
A Company, 2nd Battalion, 159th Aviation
3rd Battalion, 160th Aviation
F Company, 214th Aviation Battalion
1st Battalion, 227th Aviation
D Company, 227th Aviation
Company E, 227th Aviation Regiment
F Company, 227th Aviation

**Statement for the Record**
by
George J. Tenet
Acting Director,
**Central Intelligence Agency**
to the
**Veterans Affairs Committee**
CIA's Role in Assessing
Information Potentially Relevant to
Gulf War Illnesses

9 January 1997

Chairman Specter and Members of the Veterans Affairs Committee, I am pleased to appear before you this morning to discuss CIA's e."forts on the issue of Gulf War illnesses. I am accompanied today by CIA's Executive Director, Nora Slatkin. I want to emphasize at the outset that we know how important this issue is to Gulf War veterans and that we in the CIA will do whatever we can to help.

To go over the background first, the CIA has focused its energies on the intelligence aspects of this issue.

- We began a comprehensive review of all intelligence reporting in March 1995. We started at this date because of the President's concerns and because of issues raised by CIA employees. Until then, we were focused on uncovering still-hidden elements of Iraq's chemical and biological weapons programs. This work was important to support UNSCOM's effort to eliminate those programs.

- In our review, we examined all the intelligence reporting to help DoD determine whether or not US troops were exposed to chemical or biological agents during the Gulf War. The exposure could have been either through Iraqi use or through destruction of Iraq s chemical or biological facilities.

- We identified Khamisiyah as a potential exposure site in the course of this effort. We then took the initiative to determine what had happened there.

- The Presidential Advisory Committee last spring f.hen asked us to arrange to model events during and after the war resulting in the release of chemical agents into the atmosphere.

- As we told you during a briefing in September, we used a contractor to model releases at Muhammadiyat, Al Muthanna, and Bunker 73 at Khamisiyah.

- We were unable to have the contractor model the pit area destruction at Khamisiyah in March 1991. The data were too uncertain.

After long efforts, we think that everything possible has been done to try to model the chemical release at the Khamisiyah pit. We have learned lessons from our work. We will draw on them in the future.

As for next steps, we will continue to work with DoD and the Presidential Advisory Committee to help get answers on these important issues. We are also prepared to address your questions after this briefing.

Key Findings

Let me now go into our key findings. Since we met with you in September, our basic intelligence assessments remain unchanged. Allow me to briefly summarize those findings.

- First, we continue to believe, on the basis of a comprehensive review of intelligence, that Iraq did not deploy chemical or biological weapons in Kuwait or use them during the Gulf War.
- Second, analysis and computer modeling indicate chemical agents released by aerial bombing of chemical warfare facilities did not reach US troops in Saudi Arabia.
- Finally, our review surfaced evidence that CW agents had been released at two separate locations near Khamisiyah in southern Iraq as a result of US demolition activity.

What is new since our last appearance before you is that we have worked with an Expert Review Group to evaluate the methodologies used in modeling efforts. This is the group requested by then-DCI Deutch and convened by Deputy Secretary of Defense White. John Deutch recognized that the modeling of the demolition activity in the pit area near Khamisiyah was crucial to DoD's efforts to determine possible exposure of US veterans. He wanted to assemble the broadest possible expertise to ensure that the modeling effort was unassailable.

To this end, DoD asked the Institute of Defense Analysis (IDA) to convene a panel drawn from the scientific and technical community. The panel first met in late November and we anticipate its final report shortly fox release to the public. CIA briefed the panel on the modeling efforts and shared with it the evidence, assumptions, and methodologies. Although CIA plans to sponsor no further modeling, we will continue to work with DoD as it follows up on IDA's recommendations.

I.et me take a moment to review CIA's role in analyzing Iraq's chemical and biological weapons programs to help put into context our participation in investigating US exposure to chemical agents. I will break my remarks into three parts--our intelligence focus before, during, and after the war.

Before the War

The Intelligence Community has long followed Iraq's chemical and biological programs as part of its mission to assess chemical and biological weapons capabilities worldwide. Before the war, CIA, like others in the Intelligence Community, assessed that Iraq had a significant chemical and biological weapons capability, including chemically armed Scuds. We also assessed that Iraq had used chemical weapons on numerous occasions against Iran and its own citizens. The Intelligence Community at the time had reached consensus that Iraq had chemical weapons in its arsenal, had forward-deployed these weapons, and was prepared to use them against coalition forces.

During the War

As Desert Storm began, our concerns about the Iraqi use of weapons of mass destruction became the foremost focus of our chemical and biological weapons analytic and collection efforts. Our analysts, in cooperation with their colleagues in other agencies, sought to identify possible Iraqi CW and BW facilities for targeting purposes. In all, 32 sites were identified, albeit on incomplete and sometimes inaccurate information.

A key objective for both military and intelligence personne1 was the early detection of the use of chemical ox biologica1 weapons. We received several reports of detection alarms. CIA operated a 24-hour chemica1 and biological detection unit at the start of the air war and maintained it through the ground campaign to monitor and assess such reports.

After the War

In the months immediately following the Gulf War, we turned our intelligence assets to identifying and characterizing Iraq's CW and BW capabilities. The primary focus of our intelligence efforts during 1993 and 1994 consisted of supporting UNSCOM inspections, assessing Iraq's declarations on issues of weapons of mass destruction, refining collection requirements, and interpreting intelligence to attempt to root out the remaining Iraqi CW capabilities.

During this time CIA also worked with DoD to try to track down and check the validity and possible causes of chemical detections that had occurred during the War. A good example of this was the 19 January 1991 Czech detection of nerve agents in Saudi Arabia. In this case, we sent a detailed to Czechoslovakia to further research the claim. We also had our contractor/modeler look at possible causes for the detections. We concluded that the detections were credible due to the specificity of the equipment and the quality of the procedures used by the Czechs. However, we were unable to conclusively determine the cause. We nonetheless remain convinced that the presence of chemical agents was not due to Iraqi offensive actions such as the use of Scud missiles.

In March 1995, CIA began a thorough reexamination of re1evant intelligence. We did so because of the President's expressed concern about Gulf War Illness and because of questions raised by two CIA emp1oyees. This review culminated in the publication of our report last August.

During this reexamination, we reviewed thousands of intelligence reports and other intelligence holdings. CIA analysts drew on information from DoD and other sources to clarify intelligence, get leads, and ensure a comprehensive assessment. Our study complemented DoD investigations that used hoop testimony, medical records, and operational logs.

Let me address head-on a question that is probably on your mind, and one we have asked ourselves: why didn't CIA and the Intelligence Community focus on the potential exposure issue earlier? A number of reasons contributed to the gap between 1991 and March 1995, when we began this intelligence review. From the beginning, the consensus within the US Government was that Iraq had not used chemical or biological weapons during the war. Analysis since then has maintained that view. Moreover Iraq engaged in widespread deception with regard to where it stored its chemical weapons. Therefore, many reports received during this time were viewed with skepticism.

Shortly after the war, the conditions � now commonly referred to as Gulf War illness � had not yet been widely reported. CIA's intelligence requirements did not make it a priority to examine all incidents of potential low- level exposure.

In these circumstances, the Intelligence Community remained focused on its mission to support UNSCOM and assess the remaining Iraqi CBW capabilities. When we **did** focus more broadly on potential exposures short of actual Iraqi use, we identified two primary scenarios: fallout from aeria1 bombings in Iraq or fallout from demolition activity in the Kuwaiti Theater of Operation. Let me turn first to fallout from aerial bombings.

Based on currently available information, we conclude that Coalition aerial bombing damaged filled chemical munitions at two facilities � Muhammadiyat and A1 Muthanna. Both are located in remote areas west of Baghdad. (See briefing board) Iraq recently claimed that less than 5 percent of its approximately 700 metric tons of chemical agent stockpile was destroyed by

Coalition bombing. In most cases, the Iraqis did not store chemical munitions in bunkers that they believed the Coalition would target. They stored many of these munitions in the open to protect them from Coalition detection and bombing. In addition, Iraq had inactivated or dismantled a11 known CW agent and precursor production lines by the start of the air campaign.

At the request of the Presidential Advisory Committee, CIA had modeling pexformed of releases fxorn these facilities. That modeling work indicates that fallout from these facilities did not reach troops in Saudi Arabia.

At Muhammadiyat Storage Area, Iraq declared that 200 mustard-filled and 12 sarin-filled aerial bombs were damaged or destroyed by Coalition bombing. Bombing of this facility started on 19 January and continued throughout the air war. Analysis of all available information leads us to conclude that the earliest chemical munitions destruction date at Muhammadiyat is 22 January. We have had models created showing a worst case release of 2.9 metric tons of sarin and 15 metric tons of mustard for all possible bombing dates. For these days, as for the whole time period of the bombing, southerly winds occurred on only a few days. The maximum downwind dispersions in the general southerly direction for sarin and mustard cut off at about 300 and 130 km respectively. Neither the first effects nor the lower exposure levels-known as "general population limit" levels--reached US troops that were stationed in Saudi Arabia.

At Al Muthanna, the primary Iraqi CW production and storage facility, Iraq declared that 2,500 chemical rockets containing about 17 metric tons of sarin nerve agent had been destroyed by Coalition bombing. Analysis of all available information leads us to conclude that the earliest chemical munitions destruction date is 6 February. Of the days that the bunker at Muthanna could have been bombed, winds were southerly on only 8 February. For the "general population limit" dosage the most southerly dispersion on 8 February is 160 km, again well short of US troops.

Turning to potential exposure from fallout due to demolition activity in the Kuwait Theater of Operations, we **now** know that on 4 March 1991 US troops destroyed nerve agent-filled 122mm rockets in Bunker 73 at Khamisiyah. On about 10 March 1991 they also destroyed CW rockets at a Pit area near Khamisiyah. The munitions were not marked at either location and, no acute injuries were reported at the time.

UNSCOM inspected chemical munitions at or near Khamisiyah in October 1991 and identified 122mm sarin/cyclo-sarin (GB/GF) nerve agent-filled rockets and 155mm mustard rounds. At the time, it was not clear whether the chemical weapons identified had been present during the war or whether, as was suspected at other locations, the Iraqis had moved the munitions after the war and just prior to an UNSCOM inspection. The following information was obtained by UNSCOM during its October 1991 inspection.

- At a pit area about 1 km south of the Khamisiyah Storage Area, UNSCOM found several hundred mostly intact 122mm rockets containing nerve agent � detected by sampling and with chemical agent monitors (CAMs).
- In an open area 5 km west of Khamisiyah, inspectors found approximately 6,000 intact 155mm rounds containing mustard agent, as indicated by CAMs.
- At a third location, a single bunker among 100 bunkers, called "Bunker 73" by Iraq, remnants of 122mm rockets were identified.

The Iraqis claimed during the October 1991 inspection that Coalition troops had destroyed Bunker 73 earlier that year. We viewed the Iraqi statements with skepticism at the time because of Baghdad's widespread use of deception against UNSCOM, because we then had so little other intelligence to confirm the Iraqi assertion, and because UNSCOM itself could not verify that chemical weapons had been destroyed until 1996.

07/26/2024 08:59:44 - VA Compensation Intake Center
BEST COPY Source: EMMS

Ex E.

OMB Control No. 2900—0734
Respondent Burden: 5 minutes - Expiration Date: 07/31/2021

| Department of Veterans Affairs | REPORT OF GENERAL INFORMATION | |
|---|---|---|
| NOTE - This form must be filled out in ink or on typewriter or computer, as it becomes a permanent record in veterans' folder | 1. VA OFFICE<br>318 | 2. IDENTIFICATION NUMBERS (C, XC, SS, XSS, V, K, etc.)<br>CSS [redacted] |
| 3. LAST NAME - FIRST NAME - MIDDLE NAME OF VETERAN *(Type or print)*<br>Lodge Khamani Louis | | 4. DATE OF CONTACT *(Month, day, year)*<br>07/26/2024 |
| 5. ADDRESS OF VETERAN (Include number and street or rural route, city or P.O., State and ZIP Code)<br>924 GA HIGHWAY 80 W<br>WAYNESBORO, GA 30830 | | 6A. TELEPHONE NUMBER OF VETERAN *(Include Area Code)*<br>DAY (470)[redacted] EVENING (470)[redacted]<br>6B. E-MAIL ADDRESS *(If applicable)*<br>khlodge[redacted]m |
| 7. NAME OF PERSON CONTACTED<br>KHAMANI LODGE | | 8. TYPE OF CONTACT<br>☐ PERSONAL ☒ TELEPHONE |
| 9. ADDRESS OF PERSON CONTACTED<br>924 GA HIGHWAY 80 W<br>WAYNESBORO, GA 30830, | | 10. TELEPHONE NUMBER OF PERSON CONTACTED *(Include Area Code)*<br>(470)[redacted] |

☒ I certify that I properly identified my caller using the ID Protocol

11. BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN:

Veteran is requesting special monthly compensation claims dated 3/14/24, 4/2/24 and 5/13/24 to be processed. Per letter dated 7/3/2024 Veteran is not withdrawing claim and please process claim. He has attended C&P exams after being contacted for the purposes of reinstating claim. His phone number is 470-4[redacted]6 and Atlanta Regional Office had called and informed that evidence was received and scheduled the C&P exams which he attended

Notification of Action

☒ I read the following statement to the caller:

"I am a VA employee who is authorized to receive or request evidentiary information or statements that may result in a change in your VA benefits. The primary purpose for gathering this information or statement is to make an eligibility determination. It is subject to verification through computer matching programs with other agencies."

cc: POA *(If applicable)*: 016 - GEORGIA DEPARTMENT OF VETERAN SERVICE

| DIVISION OR SECTION 318/ENC/PJG | EXECUTED BY *(Signature and title)* *Pamela Griffis, Legal Administrative Specialist* |
|---|---|

**PRIVACY ACT NOTICE:** The VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 5, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58VA/21/22/28 Compensation, Pension, Education and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

**RESPONDENT BURDEN:** We need this information to obtain evidence in support of your claim for benefits (38 U.S.C. 501(a) and (b)). Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 5 minutes to respond to the questions on this form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. Valid OMB control numbers can be located on the OMB Internet Page at https://www.reginfo.gov/public/do/PRAMain If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.



Ex. F

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

## You don't have any submitted claims or appeals

This app shows only completed claim and appeal applications. If you started a claim or appeal but haven't finished it yet, go to eBenefits to work on it.

**April 28, 2023 letter**
Notification Letter (e.g. VA 20-8993, VA 21-0290, PCGL) >

**September 22, 2016 letter**
Notification Letter (e.g. VA 20-8993, VA 21-0290, PCGL) >

**May 19, 2016 letter**
Notification Letter (e.g. VA 20-8993, VA 21-0290, PCGL) >

**May 19, 2016 letter**
Notification Letter (e.g. VA 20-8993, VA 21-0290, PCGL) >

**May 10, 2016 letter**
Notification Letter (e.g. VA 20-8993, VA >

[redacted]

**DEPARTMENT OF VETERANS AFFAIRS**

July 3, 2024

KHAMANI LOUIS LODGE
924 GA HIGHWAY 80 W
WAYNESBORO GA 30830

In reply, refer to:
[redacted]Dev2/jaw
File Number: [redacted]
KHAMANI LODGE

**IMPORTANT -- reply needed within 30 days**

Dear Mr. KHAMANI LODGE:

We are working on your claim.

## Important Information

- Please note that the supplemental claim received on the VA Form 20-0995 (Decision Review
- Request: Supplemental Claim) dated 03-14-2024 and 05-13-2024 will be processed under the pending claim received on the VA Form 20-0996 (Decision Review Request: Higher Level Review) dated 03-14-2024.
- Both applications received had duplicate claimed contentions of traumatic brain injury and special monthly compensation.
- We also recieved a call from you on 05-24-2024 asking to withdraw your claim dated 03-14-2024. To withdraw your claim from either of the applications submitted you must do so in writing.

## What is VA.gov?

VA.gov provides electronic resources in a self-service environment to Servicemembers, Veterans, and their families. Use of these resources often helps us serve you faster! Through the VA.gov website you can:

- Submit claims for benefits and/or upload documents directly to the VA
- Request to add or change your dependents
- Update your contact and direct deposit information and view payment history
- Track the status of your claim or appeal
- Obtain verification of military service, civil service preference, or VA benefits

File Number: [redacted]
LODGE, KHAM[redacted]

- And much more!

Enrolling in VA.gov is easy. Just visit www.va.gov for more information. If you submit a claim in the future, consider filing through VA.gov. Filing electronically, especially if you participate in our fully develo[redacted] program, may result in a faster decision than if you submit your cl[redacted] the mail.

## Where to Send Written Records

Please mail all written responses to the **Compensation Benefits** address listed on the attached Where to Send Your Correspondence chart.

## If You Have Questions or Need Assistance

If you have any questions or need assistance with this claim, you may contact us by telephone, e-mail, or letter.

| If you | Here is what to do. |
|---|---|
| Telephone | Call us at 1-800-827-1000. If you use a Telecommunications Device for the Deaf (TDD), the Federal number is 711. |
| Use the Internet | Send electronic inquiries through the Internet at https://www.va.gov/contact-us/. |
| Write | VA now uses a centralized mail system. For all written communications, put your full name and VA file number on the letter. Please mail all written correspondence to the appropriate address listed on the attached *Where to Send Your Correspondence*. |

In all cases, be sure to refer to VA file number 257271506.

If you are looking for general information about benefits and eligibility, you should visit our web site at https://www.va.gov or contact us, or explore our FAQs and other resources at https://www.va.gov/contact-us/.

We sent a copy of this letter to GEORGIA DEPARTMENT OF VETERAN SERVICE, who you have appointed as your representative(s). If you have questions or need assistance, you can also contact your representative.

We look forward to resolving your claim in a fair and timely manner.

Respectfully,



1W1X700600030200020004 067806

| **Where to Send Your Correspondence** |
|---|
| Documents may be submitted by mail, in person at a VA regional office or electronically. However, VA recommends submitting correspondence electronically as this is the fastest method of receipt.<br><br>VA provides several tools to assist in electronic submission. To learn more about how to submit documents and claims electronically, visit www.va.gov/disability/upload-supporting-evidence. You can also go directly to access.va.gov to digitally upload any correspondence using QuickSubmit.<br><br>By visiting www.va.gov you can also check your claim status and learn about other VA benefits.<br><br>If you need assistance, you can find a local, accredited representative at https://www.benefits.va.gov/vso/ |

If you prefer to mail your correspondence, please use the related mailing address below:

| | |
|---|---|
| **Compensation Benefits**<br>Department of Veterans Affairs<br>Compensation Intake Center<br>P.O. Box 4444<br>Janesville, WI 53547<br>Toll Free Phone: 1-800-827-1000<br>Toll Free Fax: (844) 531-7818 | **Pension & Survivors Benefits**<br>Department of Veterans Affairs<br>Pension Intake Center<br>P.O. Box 5365<br>Janesville, WI 53547<br>Toll Free Phone: 1-800-827-1000<br>Toll Free Fax: (844) 655-1604 |
| **Board of Veterans' Appeals**<br>Department of Veterans Affairs<br>Board of Veterans' Appeals<br>P.O. Box 27063<br>Washington, DC 20038<br>Toll Free Fax: (844) 678-8979 | **Fiduciary**<br>Department of Veterans Affairs<br>Fiduciary Intake Center<br>P.O. Box 5211<br>Janesville, WI 53547<br>Toll Free Phone: 1-800-827-1000<br>Toll Free Fax: (888) 581-6826 |

These addresses serve **all United States and foreign locations.**

| | |
|---|---|
| **Veterans Crisis Line:**<br>**Dial 988 then Press 1** | You can also send a text message to 838255 to receive confidential support 24 hours a day,<br>7 days a week, 365 days a year.<br>For more information, visit<br>www.veteranscrisisline.net |

Ex. F

BVA9401373
DOCKET NO. 91-46 743 ) DATE
)
)
)

THE ISSUES

1. Permanence of a 100 percent schedular disability rating for post-traumatic stress disorder (PTSD).

2. Entitlement to special monthly compensation based on the veteran's housebound status or his need for regular aid and attendance.

REPRESENTATION

Appellant represented by: Disabled American Veterans

WITNESSES AT HEARING ON APPEAL

N. T. and J. T., Jr.

ATTORNEY FOR THE BOARD

M. W. Greenstreet, Counse

INTRODUCTION

The veteran had active service from January 1967 to May 1970.

The veteran has appealed from a March 1991 decision by the Montgomery, Alabama, Department of Veterans Affairs (VA) Regional Office (RO). The RO received the veteran's notice of disagreement in April 1991; it issued a statement of the case in May 1991; and it received the veteran's substantive appeal in June 1991.

In January 1992, the veteran's wife, Nancy, and his son, Joe, Jr., offered testimony in support of the veteran's claim at a hearing before a member of the Board of Veterans' Appeals (Board) sitting in Montgomery, Alabama.

In August 1992, the Board of Veterans' Appeals remanded this case for additional evidentiary development. The RO completed that development, confirmed its prior denial and returned the case to the Board, where it was docketed in November 1993.

In November 1993, the veteran's representative, the Disabled American Veterans, submitted an informal hearing presentation.

CONTENTIONS OF APPELLANT ON APPEAL

The veteran contends that the disability resulting from his PTSD should be considered permanent in character under 38 C.F.R. § 3.327(b)(2) (1993). He emphasizes that he necessarily is very heavily medicated and that his private physician believes that he will never be vocationally functional.

The veteran also contends that he is entitled to special monthly compensation based on his housebound status and his need for regular aid and attendance. He avers that he is prone to frequent dissociative states during which he thinks that he is back in Vietnam and that he also experiences uncontrollable rage with homicidal and suicidal ideation. His wife emphasizes that she must attend to the veteran at all times for his safety and the safety of others, and that she must

Ex. F

Ex G

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONLEY F. MONK, JR., et al., Plaintiffs, v. UNITED STATES, Defendant. | No. 3:22-cv-1503 (SRU) |

**RULING ON MOTION TO DISMISS**

This present motion to dismiss challenges the Court's power to hear claims that the U.S. Department of Veterans Affairs ("VA") has engaged in racial discrimination since World War II. Specifically, the VA compensated Black veterans for their service and sacrifice less than white veterans.

Conley F. Monk, Jr. alleges that the VA rejects Black veterans' benefits applications at a higher rate because of their race. The government insists "this case does not provide an appropriate vehicle to address such issues." MTD Mem. of Law, Doc. No. 23-1 at 10. I disagree.

For the following reasons, I **deny** the government's motion to dismiss, **doc. no. 23.**

## I. Standard of Review

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A party that moves to dismiss for lack of subject matter jurisdiction "may refer to evidence outside the pleadings." *Id.* (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint

Ex. 6

Ex. H

OMB Approved No. 2900-0XXX
Respondent Burden: 5 Minutes
Expiration Date: 08/31/2026

**Department of Veterans Affairs**

**FREEDOM OF INFORMATION ACT (FOIA) OR PRIVACY ACT (PA) REQUEST**

VA DATE STAMP
(DO NOT WRITE IN THIS SPACE)

RECEIVED
2024 JUN -4 AM 11:41
ATLANTA REGIONAL OFFICE (316)
MAIL ACTIVITY #1

**INSTRUCTIONS:** Read the Privacy Act and Respondent Burden information on Page 4 before completing the form. This form must be signed by the requester, authorized organization, or third party who has been authorized by the requester. For additional information on VA FOIA and PA requests visit our website at https://www.va.gov/FOIA/Requests.asp. You may also contact us online through Ask VA: https://ask.va.gov/ or call us toll-free at 1-800-698-2411 (TTY: 711). VA forms are available at www.va.gov/vaforms.

## SECTION I: REQUEST FOR INFORMATION ON YOURSELF

***(If you are seeking information on yourself, complete Sections I, III or IV, VI, VII and VIII. Complete Section VI, if applicable)***

**NOTE:** You may complete the form on-line or by hand. If completed by hand, print the information requested in ink, neatly and legibly, and completely fill in each applicable check box to help expedite processing of the form.

1. NAME *(First, Middle Initial, Last)*: KHANNAN L LODGE

2. SOCIAL SECURITY NUMBER: [redacted]-[redacted]-[redacted]

3. ALIEN REGISTRATION NUMBER *(A number) (If applicable)*:

4. VA FILE NUMBER *(If applicable)*:

5. DATE OF BIRTH *(MM/DD/YYYY)*: Month 06 - Day 14 - Year [redacted]

6. PLACE OF BIRTH *(Provide City and State, County and State or City and Country)*:

7. CURRENT MAILING ADDRESS *(Number and street or rural route, P.O. Box, City, State, ZIP Code and Country)*

No. & Street: 924 GA HWY 80 W

Apt./Unit Number:     City: Waynesboro

State/Province: GA     Country:     ZIP Code/Postal Code: 30830 -

8A. TELEPHONE NUMBER *(Include Area Code)*: 470 - [redacted] - [redacted]

Enter International Phone Number *(If applicable)*:

8B. FAX NUMBER *(If applicable)*: - -

Enter International FAX Number *(If applicable)*:

9. E-MAIL ADDRESS ☐ I agree to receive electronic correspondence from VA

Khlodge [redacted]

## SECTION II: REQUEST FOR INFORMATION ON A PERSON OTHER THAN YOURSELF

***(If you are seeking information on an individual other than yourself, complete Sections II, III or IV, V, VII and IX or X. Complete Section VI, if applicable)***

10. NAME *(First, Middle Initial, Last)* OR YOUR ORGANIZATION'S NAME

11. CURRENT MAILING ADDRESS *(Number and street or rural route, P.O. Box, City, State, ZIP Code and Country)*

No. & Street:

Apt./Unit Number:     City:

State/Province:     Country:     ZIP Code/Postal Code: -

12A. TELEPHONE NUMBER *(Include Area Code)*: - -

Enter International Phone Number *(If applicable)*:

12B. FAX NUMBER *(If applicable)*: - -

Enter International FAX Number *(If applicable)*:



Ex. H

**Department of Veterans Affairs**

# INFORMATION AND INSTRUCTIONS ON HOW TO SUBMIT A FREEDOM OF INFORMATION ACT (FOIA) OR PRIVACY ACT REQUEST (PA)

**IMPORTANT:** This form is <u>**ONLY**</u> used to request military records or a veteran's benefit records.

Please complete the attached form to submit a Freedom of Information Act (FOIA) or Privacy Act (PA) request. It must be signed by the requester, veteran or third-party authorized to act on behalf of the requester.

**WHAT IS A FOIA REQUEST?**
A FOIA request provides the public the right to request access to records from Federal agencies, except those protected by the nine FOIA exemptions. For additional information please visit https://www.va.gov/FOIA/index.asp.

**WHAT IS A PA REQUEST?**
A citizen of the United States or an alien lawfully admitted for permanent residence ma[redacted]ss to o[redacted]me[redacted] on herself/himself from a System of Records (SORs). Examples of PA records are personal [redacted]-F[redacted], educatio[redacted] beneficiary records. For additional information please visit https://www.oprm.va.gov/privacy/.

**VERIFICATION OF IDENTITY AND CONSENT FOR PA REQUESTS ONLY** [redacted]
A request must include the following information:

- Your full name;
- Your date of birth;
- Your place of birth;
- Your current mailing address; and
- Handwritten signature is required.

**NOTE:** To help us locate requested records, please include your Social Security [redacted] r [redacted]ion number (A-number).

**WHERE TO SEND YOUR REQUEST:**
**NOTE:** All Privacy Act requests must be sent to the Centralized Support Division address listed below.

[redacted]

| RECORDS CUSTODIAN | MAIL or FAX TO |
|---|---|
| <u>Centralized Support Division</u><br>Claim Files, Service Treatment Records/<br>Military Treatment Records,<br>DD Form 214, C&P Exams etc. | Department of Veterans Affairs<br>Evidence Intake Center<br>PO Box 4444<br>Janesville, WI 53547-4444<br>Toll-free Phone: 1-800-827-1000<br>Toll-free Fax: (844) 531-7818 |

SOCIAL SECURITY NUMBER [ ] – [ ] – [ ]

## SECTION II: REQUEST FOR INFORMATION ON A PERSON OTHER THAN YOURSELF *(Continued)*

***(If you are seeking information on an individual other than yourself, complete Sections II, III or IV, V, VII and IX or X. Complete Section VI, if applicable)***

NOTE: Items 13 through 16 must be completed to inform VA on whom the person is you are requesting the information about

13. NAME OF THE PERSON YOU ARE REQUESTING INFORMATION ON *(First, Middle Initial, Last)*

14. SOCIAL SECURITY NUMBER

15. ALIEN REGISTRATION NUMBER *(A-number) (If applicable)*

16. VA FILE NUMBER *(If applicable)*

## SECTION III: COMPENSATION AND PENSION RECORDS REQUEST

***(This information is required in order to complete the request)***

17. SELECT THE TYPE(S) OF RECORDS YOU ARE REQUESTING BELOW

☐ CLAIMS FILE (C-FILE) ☐ SERVICE TREATMENT RECORDS / MILITARY TREATMENT RECORDS ☐ DD FORM 214

☐ DISABILITY EXAMINATIONS (C & P EXAMS) *(If applicable enter date of exam in Section VI, Item 20, Remarks)* ☐ PENSION BENEFIT DOCUMENTS

☐ OFFICIAL MILITARY PERSONNEL FILE *(OMPF)* ☒ OTHER *(Specify)* 4/18/24 C/P Exmation

## SECTION IV: ALL OTHER BENEFIT RECORDS REQUEST

***(This information is required in order to complete the request)***

18. SELECT THE TYPE(S) OF RECORDS YOU ARE REQUESTING BELOW

☐ VETERAN READINESS AND EMPLOYMENT RECORDS ☐ FIDUCIARY SERVICES RECORDS

☐ EDUCATION BENEFIT RECORDS ☐ FINANCIAL RECORDS *(If applicable, specify which records are being requested in Section VI, Item 20, Remarks)*

☐ HOME LOAN BENEFIT RECORDS ☐ LIFE INSURANCE BENEFIT RECORDS *(If applicable, enter policy number in Section VI, Item 20, Remarks)*

☐ OTHER *(Specify)*

## SECTION V: VA REGIONAL OFFICE INFORMATION *(If known)*

19. PROVIDE NAME OF VA REGIONAL OFFICE YOU ARE ASSOCIATED WITH

## SECTION VI: REMARKS

20. REMARKS *(If any)*

## SECTION VII: WILLINGNESS TO PAY FEES

21. **IMPORTANT:** For the purpose of fees only, FOIA divides requesters into three categories: (1) commercial requesters may be charged fees for searching for records, reviewing the records, and photocopying them; (2) educational, non-commercial scientific institutions, and representatives of the news media are charged for photocopying after the first 100 pages; (3) all other requesters (requesters who do not fall into any of the other two categories) are charged for photocopying after the first 100 pages and for time spent searching for records in excess of two hours. VA charges $0.15 per single-sided page for photocopying. Actual costs are charged for a format other than paper copies.

An agency may grant fee waivers if the requester successfully demonstrates that disclosure of information is in the public's interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

☐ I AM WILLING TO PAY THE APPLICABLE FEES UP TO THE AMOUNT OF $ [ ].00

☐ IF YOU BELIEVE YOU ARE ENTITLED TO A FEE WAIVER OR EXPEDITED PROCESSING, PLEASE INDICATE

SOCIAL SECURITY NUMBER [ ] – [ ] – [ ]

## SECTION VIII: REQUESTER CERTIFICATION AND SIGNATURE

**I CERTIFY THAT** I have completed this FOIA/PA request and declare it is true and correct to the best of my knowledge and belief

| 22A. REQUESTER'S SIGNATURE *(REQUIRED) (SIGN IN INK)* | 22B. DATE SIGNED *(MM DD YYYY)* |
|---|---|
| [signature] | Month 07 – Day 04 – Year 2024 |

## SECTION IX: THIRD-PARTY CERTIFICATION AND SIGNATURE

***(Valid only if Section II has been completed and requester has an authorized third party)***

**I CERTIFY THAT** the requester has authorized me as the undersigned representative and certifies that the truth and completion of the information contained in this document is to the best of the requesters knowledge and belief.

**NOTE**: A third-party signature ***will not*** be accepted unless a valid VA Form 21-0845, *Authorization to Disclose Personal Information to a Third Party* is of record or completed and attached to this request. A third-party may be a family member or other designated person who is not a Power of Attorney, agent, or fiduciary.

| 23A. THIRD-PARTY SIGNATURE *(Sign in ink)* | 23B. DATE SIGNED *(MM DD/YYYY)* |
|---|---|
| | Month – Day – Year |

## SECTION X: POWER OF ATTORNEY *(POA)* CERTIFICATION AND SIGNATURE

***(Valid only if Section II has been completed and requester has authorized POA representation)***

**I CERTIFY THAT** the requester has authorized me as the undersigned representative and certifies the truth and completion of the information contained in this document to the best of the requesters knowledge and belief.

**NOTE**: A POA's signature ***will not*** be accepted unless a valid VA Form 21-22, *Appointment of Veterans Service Organization as Claimant's Representative* or VA Form 21-22a, *Appointment of Individual as Claimant's Representative* is of record or attached to this request.

| 24A. POA/AUTHORIZED REPRESENTATIVE SIGNATURE *(Sign in ink)* | 24B. DATE SIGNED *(MM DD YYYY)* |
|---|---|
| | Month – Day – Year |

**PENALTY**: The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material fact knowing it to be false, or for fraudulent receipt of any document to which you are not entitled.

**PRIVACY ACT INFORMATION** VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58VA21 22 28, Compensation, Pension, Education, Veteran Readiness and Employment Records - VA, published in the Federal Register. Your obligation to respond is voluntary.

**RESPONDENT BURDEN:** We need this information to identify and obtain the information you are requesting. Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 5 minutes to review the instructions, find the information, and complete this form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

Ex I

DEPARTMENT OF VETERANS AFFAIRS
**Veterans Benefits Administration**
**Regional Office**

**KHAMANI Lodge**

**VA File Number**
[redacted]

**Represented By:**
GEORGIA DEPARTMENT OF VETERAN SERVICE
**Rating Decision**
**04/27/2023**

## INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Army from October 3, 1990 to April 17, 1992. You filed a new claim for benefits that was received on January 9, 2023. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

## DECISION

Service connection for traumatic brain damage (TBI) is denied.

## EVIDENCE

- Correspondence, received on April 12, 2023
- VA Form 21-4138 Statement In Support of Claim, received on April 12, 2023
- VA 27-0820 Report of General Information, received on April 11, 2023
- Atlanta VAMC 09/13/2013-01/30/2023, received on March 07, 2023
- Augusta VAMC 02/19/2021-02/21/2023, received on March 07, 2023
- C&P Exam, received on February 16, 2023

- DBQ Medical Opinion LHI 02/15/2023, received on February 16, 2023
- DBQ NEURO Initial Evaluation of TBI LHI 02/15/2023, received on February 16, 2023
- VA Exam Worksheet, received on February 01, 2023
- Exam Request, received on February 01, 2023
- VA Memo, received on January 27, 2023
- Status Letter, received on January 12, 2023
- Correspondence, received on January 10, 2023
- Congressionals, received on January 10, 2023
- Medical Treatment Record - Government Facility (Progress/Augusta VAMC notes 03/01/2022), received on January 10, 2023
- VA 21-526EZ, Fully Developed Claim (Compensation), received on January 10, 2023
- Court Documents - General, received on January 10, 2023
- Correspondence, received on January 10, 2023
- BVA Decision, received on January 10, 2023
- Congressionals, received on January 10, 2023
- VA Form 21-4138 Statement In Support of Claim, received on January 09, 2023
- Correspondence, received on January 09, 2023
- VA 21-526EZ, Fully Developed Claim (Compensation), received on January 09, 2023
- STRs (10/1990-04/1992), received on October 14, 1993
- DD214 (10/1990-04/1992), received on April 17, 1992, April 30, 1994, April 17, 2002
- Military personnel records (10/1990-04/1992), received on April 30, 1992, July 13, 1992, June 01, 1994, April 02, 1996, September 25, 1996, December 23, 1996, January 28, 1997, July 24, 1997, January 30, 1998, July 31, 2013

## REASONS FOR DECISION

### Service connection for traumatic brain damage (TBI) as due to an undiagnosed illness.

Service connection may be granted for a disability which began in military service or was caused by some event or experience in service. Service connection for traumatic brain damage (TBI) is denied because the medical evidence of record fails to show that this disability has been clinically diagnosed. (38 CFR 3.303, 38 CFR 3.304)

A direct grant of service connection requires: 1) medical evidence of a current disability, 2) evidence of the incurrence or aggravation of a disease or injury in active military service, and 3) medical evidence of a nexus (link) between the current disability and the in-service disease or injury. (38 CFR 3.303, 38 CFR 3.304)

The evidence does not show an event, disease or injury in service. (38 CFR 3.303, 38 CFR 3.304)

We did not find a link between your medical condition and military service. (38 CFR 3.303) Your service treatment records do not contain complaints, treatment, or diagnosis for this condition.

The "Persian Gulf War Veterans' Benefits Act" authorizes VA to compensate any Gulf veteran suffering from a "qualifying chronic disability," resulting from an undiagnosed illness or combination of undiagnosed illnesses, appearing either during active duty in the Southwest Asia theater of operations, Afghanistan, Israel, Egypt, Turkey, Syria, or Jordan, during the Gulf War, or became manifest to any degree at any time following service in theater. Section 202 of the "Veterans Education and Benefits Expansion Act of 2001" expanded the definition of "qualifying chronic disability" to include (1) a medically unexplained chronic multi-symptom illness (such as chronic fatigue syndrome, fibromyalgia, and functional gastrointestinal disorders) that is defined by a cluster of signs or symptoms; and (2) any diagnosed illness that the Secretary of the VA determines in regulations warrants a presumption of service-connection. To fulfill the requirement for chronicity, the claimed illness must have persisted for a period of 6 months. The 6-month period of chronicity is measured from the earliest date on which all pertinent evidence establishes that the signs or symptoms of the disability first became manifest. (38 USC 1117, 38 CFR 3.317)

Service connection under this provision is precluded if there is affirmative evidence that the disability was unrelated to service in Southwest Asia theater of operations, Afghanistan, Israel, Egypt, Turkey, or Jordan. Service connection for traumatic brain injury is denied on this basis because evidence established that this condition is a resulted of physical trauma, therefore unrelated to service. (38 USC 1117, 38 CFR 3.317)

While a review of your military personnel records noted that you served in Saudi Arabia from February 1991 to April 1991 and evidence of record noted that you were in a unit that was near Khamisiyah Iraq in early March 1991 from which agents sarin and cycosarin may have been released into the air, a review of evidence of record fails to show that you have a confirmed clinical diagnosis from which service connection may be warranted.

4/18/24
6/22/24

"The term traumatic brain injury (TBI) means the physical, cognitive and/or behavioral/emotional residual disability resulting from an event of external force causing an injury to the brain."

An examination and/or medical opinion based on toxic exposure risk activity (TERA) was not requested because the evidence shows your disability is physical trauma, there is no evidence that you have a current diagnosis of TBI, and the Secretary has determined there is no indication of association between this condition and participation in a TERA. There is also no competent medical or scientific evidence of an association between your claimed disability and in-service TERA. (38 U.S.C. 1168)

Service connection for traumatic brain damage (TBI) is also denied on a direct basis since this condition neither occurred in nor was caused by service. (38 CFR 3.303, 38 CFR 3.304)

There is no evidence of record that shows that you are unable to manage your financial affairs. (38 CFR 3.353)

Favorable Findings identified in this decision:

Evidence shows that you performed service in Saudi Arabia from February 1991 to April 1991.

You were exposed to environmental hazard exposure during military service while in Southwest Asia (Saudi Arabia).

**REFERENCES:**

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all Veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our website, www.va.gov.

OMB Control No. 2900-0721
Respondent Burden: 30 minutes
Expiration Date: 02/28/2026

Department of Veterans Affairs

# EXAMINATION FOR HOUSEBOUND STATUS OR PERMANENT NEED FOR REGULAR AID AND ATTENDANCE

VA DATE STAMP
(DO NOT WRITE IN THIS SPACE)

**INSTRUCTIONS**: Before completing this form, read the Privacy Act and Respondent Burden on page 4. Use this form to determine eligibility for aid and attendance or housebound benefits. For more information, you can contact us online through Ask VA: https://ask.va.gov/. Ask us a question online or call us toll-free at 1-800-827-1000 (TTY: 711). VA forms are available at www.va.gov/vaforms.

## SECTION I: VETERAN'S IDENTIFICATION INFORMATION

**NOTE**: You may complete the form online or by hand. If completing by hand, print neatly and legibly in ink, and completely fill in each applicable check box to help expedite processing of the form.

1. VETERAN/BENEFICIARY'S NAME (First, Middle Initial, Last): KHAMANI LODGE

2. SOCIAL SECURITY NUMBER: [redacted]

3. VA FILE NUMBER (If applicable):

4. VETERAN'S SERVICE NUMBER (If applicable):

5. DATE OF BIRTH (MM/DD/YYYY): 06 – 14 – 1966

## SECTION II: CLAIMAINT'S IDENTIFICATION INFORMATION

6. CLAIMANT'S NAME (First, Middle Initial, Last):

7. CLAIMANT'S SOCIAL SECURITY NUMBER: – –

8. RELATIONSHIP OF CLAIMANT TO VETERAN
- ☐ SELF
- ☐ PARENT
- ☐ SPOUSE
- ☐ CHILD

9. CLAIMANT'S DATE OF BIRTH (MM/DD/YYYY): – –

10. MAILING ADDRESS (Number and street or rural route, P. O. Box, City, State, ZIP Code and Country)

No. & Street: 924 GA HWY 80 W
Apt./Unit Number:
City: WAYNESBORO
State/Province: GA
Country:
ZIP Code/Postal Code: 30830 –

11. TELEPHONE NUMBER (Optional) (Include Area Code): 470 – [redacted]

Enter International Phone Number (If applicable):

12. EMAIL ADDRESS (Optional) ☐ I agree to receive electronic correspondence from VA in regards to my claim.

KHLODG[redacted]

## SECTION III: CLAIM INFORMATION

13. SELECT ONE OF THE FOLLOWING BENEFITS (Choose one)

☒ **Special Monthly Compensation (SMC) -** Veterans and surviving spouses or parents who are eligible to receive VA compensation due to a service-related disability or death and require aid and attendance of another person to perform personal functions required in everyday living such as bathing, feeding, dressing, attending to the wants of nature, adjusting prosthetic devices, or protecting oneself from the hazards of the daily environment may be eligible for Special Monthly Compensation. A veteran or a deceased veteran's surviving spouse may also be eligible for Special Monthly Compensation based on being housebound (substantially confined to the immediate premises because of permanent disability). For a veteran, the disability causing the need for aid and attendance or housebound status must be related to service. These benefits are paid in addition to monthly compensation or Dependency Indemnity Compensation (DIC). They are not paid without eligibility to compensation.

☐ **Special Monthly Pension (SMP) -** Veterans and survivors who are eligible for Veteran's Pension and/or Survivors benefits and require the aid and attendance of another person in order to perform personal functions required in everyday living, such as bathing, feeding, dressing, attending to the wants of nature, adjusting prosthetic devices, or protecting them from the hazards of their daily environment, or are housebound (substantially confined to their immediate premises because of permanent disability), may be eligible for Special Monthly Pension (SMP). This benefit is an increased monthly amount paid to a veteran or survivor who is eligible for Veterans Pension or Survivors benefits.

VETERAN'S SOCIAL SECURITY NUMBER [ ] - [ ] - [ ]

## SECTION IV: IS VETERAN/CLAIMANT HOSPITALIZED?

14A. IS THE CLAIMANT HOSPITALIZED?

☐ YES (If "YES," complete Items 14B, 14C & 14D)

☒ NO (If "NO," skip to Section V)

14B. DATE ADMITTED (MM/DD/YYYY)

14C. NAME OF HOSPITAL

14D. ADDRESS OF HOSPITAL

## SECTION V: CERTIFICATION AND SIGNATURE

**I CERTIFY THAT** the statements on this form are true and correct to the best of my knowledge and belief.

15A. VETERAN/CLAIMANT'S SIGNATURE (Required) [signature]

15B. DATE SIGNED (MM/DD/YYYY) 03-21-2024

## SECTION VI: EXAMINATION INFORMATION
**(IMPORTANT: Remainder of form MUST be filled out by Examiner)**

**NOTE:** Examiner **must be** a Medical Doctor (MD) or Doctor of Osteopathic (DO) medicine, physician assistant or advanced practice registered nurse.

16. DATE OF EXAMINATION (MM/DD/YYYY)

**NOTE: EXAMINER PLEASE READ CAREFULLY**

The purpose of this examination is to record manifestations and findings pertinent to the question of whether the veteran/claimant is housebound (confined to the home or immediate premises) or in need of the regular aid and attendance of another person. Please provide as much description as needed for each question as this will assist VA to determine if the disease(s) or injury(ies) listed may lead to physical or mental impairment, loss of coordination or enfeeblement that require assistance with daily living. Findings should be recorded to show whether the claimant is blind or bedridden. Whether the claimant seeks housebound or aid and attendance benefits, the report should reflect how well they ambulate, where they go, and what they are able to do during a typical day.

17. PROVIDE COMPLETE DIAGNOSIS WITH MOST SIGNIFICANT SYMPTOMS FOR EACH CONDITION (Diagnosis needs to equate to the level of assistance described in Items 26 through 37) (Describe below)

18. WHAT DISABILITY(IES) ARE CONSIDERED PERMANENT AND TOTALLY DISABLING? (Describe below)

| | | | |
|---|---|---|---|
| A. | | D. | |
| B. | | E. | |
| C. | | F. | |

19A. AGE

19B. WEIGHT — ACTUAL LBS. / ESTIMATED LBS.

19C. HEIGHT — FEET / INCHES

20. NUTRITION

21. GAIT

22. BLOOD PRESSURE

23. PULSE RATE

24. RESPIRATORY RATE

25. WHAT DISABILITIES RESTRICT THE LISTED ACTIVITIES/FUNCTIONS?

VETERAN'S SOCIAL SECURITY NUMBER ☐☐☐ – ☐☐ – ☐☐☐☐

26. IF THE PATIENT IS CONFINED TO BED, INDICATE THE NUMBER OF HOURS IN BED

From 9 PM to 9 AM: ☐☐ From 9 AM to 9 PM: ☐☐

27. DOES THE PATIENT REQUIRE ASSISTANCE WITH ANY OF THE FOLLOWING ACTIVITIES? (Select ALL that apply)

- ☐ BATHING/SHOWERING
- ☐ TENDING TO HYGIENE NEEDS
- ☐ ADDITIONAL ACTIVITIES (i.e., housekeeping, laundering, meal preparation, etc.) (Specify additional activity below)
- ☐ EATING OR SELF-FEEDING
- ☐ TRANSFERRING IN OR OUT OF BED/CHAIR
- ☐ DRESSING
- ☐ TOILETING
- ☐ AMBULATING WITHIN THE HOME OR LIVING AREA
- ☐ MEDICATION MANAGEMENT

28A. IS THE PATIENT LEGALLY BLIND? (If "Yes," provide explanation)

- ☐ YES
- ☐ NO

28B. CORRECTED VISION

| LEFT EYE | RIGHT EYE |
|---|---|
| ☐☐☐ | ☐☐☐ |

29. DOES THE PATIENT REQUIRE NURSING HOME CARE? (If "Yes," provide explanation)

- ☐ YES
- ☐ NO

30. IN YOUR JUDGMENT, DOES THE PATIENT HAVE THE MENTAL CAPACITY TO MANAGE THEIR BENEFIT PAYMENTS, OR ARE THEY ABLE TO DIRECT SOMEONE TO DO SO?

- ☐ YES
- ☐ NO

(If "NO," provide the disability(ies) that prevent them from performing this function and any rationale to support your conclusion in the space provided)

31. WHAT IS THE POSTURE AND GENERAL APPEARANCE OF THE PATIENT? (Describe)

32. DESCRIBE RESTRICTIONS OF EACH UPPER EXTREMITY WITH PARTICULAR REFERANCE TO GRIP, FINE MOVEMENTS, AND ABILITY TO FEED THEMSELVES, TO BUTTON CLOTHING, SHAVE AND ATTEND TO THE NEEDS OF NATURE

33. DESCRIBE RESTRICTIONS OF EACH LOWER EXTREMITY WITH PARTICULAR REFERANCE TO THE EXTENT OF LIMITATION OF MOTION, ATROPHY, AND CONTRACTURES OR OTHER INTERFERENCE. (**NOTE:** If indicated, comment specifically on weight bearing, balance and propulsion of each lower extremity)

34. DESCRIBE RESTRICTION OF SPINE, TRUNK, AND NECK

VETERAN'S SOCIAL SECURITY NUMBER ☐☐☐ – ☐☐ – ☐☐☐☐

35. DESCRIBE ALL OTHER PATHOLOGY INCLUDING THE LOSS OF BOWEL OR BLADDER CONTROL OR THE EFFECTS OF ADVANCING AGE; SUCH AS DIZZINESS, LOSS OF MEMORY OR POOR BALANCE, THAT AFFECTS PATIENT'S ABILITY TO PERFORM SELF-CARE, OR IF HOSPITALIZED, BEYOND THE WARD OR CLINICAL AREA

36. HOW OFTEN PER DAY OR WEEK AND UNDER WHAT CIRCUMSTANCES (to include the level of assistance required) IS THE PATIENT ABLE TO LEAVE THE HOME OR IMMEDIATE PREMISES (Describe)

37. ARE AIDS SUCH AS CANES, BRACES, CRUTCHES, OR THE ASSISTANCE OF ANOTHER PERSON REQUIRED FOR LOCOMOTION?

☐ YES (If "YES," check the applicable box or specify distance) ☐ 1 BLOCK ☐ 5 OR 6 BLOCKS ☐ 1 MILE OTHER (Specify distance)____________

☐ NO

## SECTION VII: EXAMINER'S SIGNATURE

| 38. PRINTED NAME OF EXAMINER | 39. TITLE OF EXAMINER |
|---|---|
| 40. SIGNATURE OF EXAMINER **(REQUIRED)** | 41. DATE SIGNED (MM/DD/YYYY) ☐☐ – ☐☐ – ☐☐☐☐ |

## SECTION VIII: EXAMINER'S INFORMATION

42. NATIONAL PROVIDER IDENTIFIER (NPI) NUMBER OF EXAMINER

43. NAME OF MEDICAL FACILITY

44. ADDRESS OF MEDICAL FACILITY (Number and street or rural route, city, state, ZIP Code and Country)

45. TELEPHONE NUMBER OF MEDICAL FACILITY (Include Area Code)

☐☐☐ – ☐☐☐ – ☐☐☐☐ Enter International Phone Number (If applicable)

**PENALTY:** The law provides severe penalties (including fine and/or imprisonment) for willfully submitting any statement or evidence of a material fact you know to be false, or for fraudulent receipt of any document you are not entitled to.

**PRIVACY ACT NOTICE:** The VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records. 58VA21/22/28, Compensation, Pension, Education and Veteran Readiness and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. Giving us your Social Security Number (SSN) account information is mandatory. Applicants are required to provide their SSN under Title 38, U.S.C. 5701(c)(1). The VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure is required by a Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits provided under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information that you furnish may be utilized in computer matching programs with other Federal or state agencies for the purpose of determining your eligibility to receive VA benefits, as well as to collect any amount owed to the United States by virtue of your participation in any benefit program administered by the Department of Veterans Affairs.

**RESPONDENT BURDEN:** We need this information to determine your eligibility for aid and attendance or housebound benefits. Title 38, United States Code 1521 (d) and (e), 1115(1)(e), 1311(c) and (d), 1315(h), 1122, 1541(d)(e), and 1502 (b) and (c) allows us to ask for this information. We estimate that you will need an average of 30 minutes to review the instructions, find the information, and complete this form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet website at **http://www.reginfo.gov/public/do/PRAMain**. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

# Veterans Evaluation Services

Ph: 1.877.637.8387 vesservices.com

KHAMANI LODGE
924 GA HIGHWAY 80 W
WAYNESBORO, GA 30830

**DATE :** 6/3/2024
**VES #:** 227241153821

Veterans Evaluation Services (VES) is currently working with the VA to assist veterans requiring compensation and/or pension evaluations. A request was sent to us by the VA to handle your compensation/pension exams, and an appointment has been scheduled for you at the following time and location (map enclosed):

| APPOINTMENT INFORMATION | |
|---|---|
| **Exam Date:** | 6/21/2024 |
| **Exam Time:** | 3:00 PM EST |
| **Provider:** | CHRISTOPHER BELL, Ph.D. |
| **Location:** | 4210 COLUMBIA ROAD, BUILDING 15 SUITE B, AUGUSTA, GA 30907 |

VES is working to complete your exam(s) on an expedited basis. The results of your exam(s) are a critical component in determining your eligibility for VA disability compensation and/or pension benefits. Therefore, it is imperative you notify us as soon as possible if you are unable to attend your scheduled appointment.

If you need to reach us, please contact us at 713-255-5656 or toll-free at 1-877-637-8387. For security purposes, you will be asked to verify your date of birth or the last 4 digits of your claim number.

Scheduling of your exam(s) is in strict adherence to VA guidelines and you have been scheduled with the nearest VA approved examiner at the soonest available date and time in order to expedite the exam portion of your claims process. You may also soon be scheduled for tests, laboratory procedures, and/or x-rays on the same day or on multiple days. Please take note of the following in regards to your scheduled appointment(s), and read the frequently asked questions (FAQs) enclosed.

## APPOINTMENT LOCATION

MedSuites
4210 Columbia Road
Building 15 Suite B
Augusta, GA 30907

N

